MICHIGAN MINERALS, INC., v. WILLIAMS.

1. FRAUD—KNOWLEDGE TO CONTRARY OF A REPRESENTATION.
   Fraud is not perpetrated upon one who has full knowledge to the contrary of a representation.

2. MINES AND MINERALS—OIL AND GAS LEASE—FINDING OF COURT—FRAUD.
   In suit against a partner for an accounting and for the appointment of a receiver over certain oil leases, finding of trial court that defendant had not made any misrepresentations that induced plaintiffs to consent to the drilling of wells is affirmed where it appears defendant had a substantial interest in the leases, was an experienced oil man and was the managing partner of all interests involved.

3. APPEAL AND ERROR—FINDING OF FACT—ACCOUNTING—OIL AND GAS LEASES—EVIDENCE.
   Finding of facts as finally determined by trial court in suit for accounting by managing partner of oil lease operations *held,* supported by evidence in record containing a multitude of contested exhibits.

4. EQUITY—RECEIVERS.
   A court of equity has inherent power to appoint a receiver.

5. RECEIVERS—APPOINTMENT ANCILLARY TO OTHER RELIEF.
   The appointment of a receiver is a harsh proceeding and should be resorted to only in extreme cases and can be made only as ancillary to other relief sought.

6. SAME—APPOINTMENT—DISCRETION OF COURT.
   Trial court's refusal to appoint a receiver over oil leases managed by defendant, a competent oil man who owned a part interest in the leases, was not an abuse of discretion notwithstanding grave doubt entertained as to the accuracy of some of the bookkeeping items presented by him.

Appeal from Kent; Hoffius (Cornelius), J. Submitted June 18, 1943. (Docket No. 52, Calendar No. 42,111.) Decided October 11, 1943. Rehearing denied November 29, 1943.

Bill by Michigan Minerals, Inc., a Michigan corporation, against H. C. Williams for an accounting, an injunction and a receiver. Cross bill by defendant against plaintiff for an accounting and an equitable lien. Pearl A. Williams intervened as a party defendant. H. R. Fothergill and Kinwell Oil Company, a Michigan corporation, intervened for the purpose of obtaining relief sought in plaintiff's bill of complaint. Cross bill amended to make interveners parties defendant. Decree for defendants. Plaintiffs Michigan Minerals, Inc., and Kinwell Oil Company appeal. Defendants Williams cross-appeal. Affirmed.

*Samuel S. Willis, Norris, McPherson, Harrington & Waer,* and *John C. Cary,* for plaintiffs.

*McCobb & Heaney* and *Robert J. Miller,* for defendants.

SHARPE, J. This is a suit brought by plaintiff Michigan Minerals, Inc., for an accounting and the appointment of a receiver over certain oil leases in Kent and Ottawa counties in which Michigan Minerals, Inc., and defendant Williams are the owners of fractional interests. Kinwell Oil Company, owner of fractional interests in the same leases, and H. R. Fothergill, owner of an interest in one of these leases, intervened as parties plaintiff and prayed for the same relief.

This case, like many others, contains disputed questions of fact. The record is voluminous. Approximately 700 exhibits were introduced. It ap-

pears that in August, 1939, H. C. Williams, defendant herein, owned four oil and gas leases in the Walker field in Kent and Ottawa counties, known as the Grand Rapids Trust, Thurkettle, Kasperlik, and Riddering leases. Williams, in order to develop the territory and operate the wells, entered into a written agreement with a group of men from Detroit, known as the Michigan Syndicate. Under this agreement, dated September 12, 1939, the Michigan Syndicate bought a one-fourth working interest in the four leases for $12,500 and agreed to pay one-fourth the expense of working each lease, after the work was done. On November 25, 1939, it bought, on the same terms, an additional undivided one-eighth working interest in these leases for $6,250. On the same day, Williams sold, on the same terms, to Kinwell Oil Company a one-eighth working interest in the same leases for $6,250.

Under the above agreements, Williams agreed to drill two wells into the Traverse formation and, if oil should be found in paying quantities, to equip the same "excluding the furnishing of pumping or lifting units." While the No. 1 well on the Grand Rapids Trust Company lease was being drilled, it became necessary to start the drilling of a well on the Thurkettle lease. This well was started on September 13, 1939, was completed on October 13, 1939, and immediately became a producer. Wells No. 2 and No. 3 on the Thurkettle lease were drilled in October and November and became producers. The fourth well on this lease was completed in December of the same year. As each well was completed, Williams equipped it for production and continued to operate the lease, purchasing such supplies and employing labor as he needed the same.

Subsequent to the completion of these wells, Williams, the Michigan Syndicate, and the Kinwell

Oil Company entered into an agreement respecting the Kobel-Lawrence lease in which Williams had an interest. The Michigan Syndicate purchased a three-eighths working interest in the lease and Kinwell Oil Company purchased a one-eighth working interest in the same lease. Other leases known as the Breen Gravel Company and Boyland leases became available and Williams bought an interest in these leases. The Michigan Syndicate and Kinwell Oil Company each took a one-eighth interest in these leases. Wells were drilled, but proved unproductive.

Early in 1940, the Michigan Syndicate was incorporated under the name of Michigan Minerals, Inc. The corporation took over the properties of the Michigan Syndicate and assumed all of its obligations. On January 25, 1940, Williams commenced the development of the Kasperlik lease. A well was drilled and finally abandoned. In February, 1940, Williams commenced the drilling of a well on the Bryan lease. Michigan Minerals, Inc., and Kinwell Oil Company each purchased a one-eighth interest in this lease on a completed well basis for $1,500 each. The well was completed and proved to be a commercial well. On March 25, 1940, Williams commenced the drilling of a well on the Forstrum lease. Michigan Minerals, Inc., and Kinwell Oil Company each took a one-eighth working interest in the lease. The well proved to be a dry hole.

In January, 1940, Oliver Hollopeter was employed by Williams as his agent in the drilling and operating of the wells. This employment was approved by the Michigan Minerals, Inc., and Kinwell Oil Company of which Hollopeter was an officer. In June, 1940, Williams offered Michigan Minerals, Inc., and Kinwell Oil Company a so-called dry hole credit of $6,000, $3,750 to be credited to

Michigan Minerals, Inc., and $2,250 to be credited to Kinwell Oil Company. This credit was to pay for participation in new drilling ventures. Williams applied $1,500 of this credit in payment of a one-sixteenth of a seven-eighths working interest for each company in the Beaumont lease. Later, Williams transferred to Michigan Minerals, Inc., an additional four-sixteenths of his working interest in the same lease.

In August or September, 1940, Williams was anxious to drill a well in the center of the Thurkettle lease. On October 25, 1940, Williams attended a meeting of the directors of both companies at which there was some discussion of drilling a fifth well. Williams went ahead and drilled the well against the protests of the officers of both companies. The well produced oil.

Dissension between the parties grew and in February, 1941, Michigan Minerals, Inc., filed its bill of complaint in the circuit court of Kent county for an accounting and the appointment of a receiver. In the bill of complaint and amendments to the same, it is charged that Williams damaged the Thurkettle lease by the drilling of the fifth well; that he had wrongfully retarded gas pressure on the four wells on the Thurkettle lease so as to make the fifth well look better; that Williams granted the exclusive right to purchase the oil runs from the Thurkettle lease to the Leonard Pipe Line Company without Michigan Minerals' consent; that he had manipulated the pipe line runs; that defendant Williams has failed and refused to properly maintain and operate the Beaumont and Bryan wells; that Williams has been guilty of mismanagement and inefficient operation of all leases; and that he has refused and neglected to keep correct and accurate books of account.

Defendant filed an answer to the bill of complaint and a cross bill in which he says that by contracts with Michigan Minerals, Inc., he drilled, acidized, completed, operated and repaired oil and gas wells on each of the leases; that Michigan Minerals, Inc., became indebted to defendant in the amount of $38,414.60; that Michigan Minerals, Inc., has paid defendant to apply on such amount the sum of $27,500; and that there is due defendant from Michigan Minerals, Inc., the sum of $10,914.60.

The trial court filed an opinion in which he stated:

"Viewing the record of the drilling and operation of these leases as a whole, the court is convinced that Williams was honest in his dealings with the plaintiffs and did all that was reasonably required to produce the wells in which the parties were interested. At times there may have been some lack of diligence by employees, unfortunate disruptions due to mechanical difficulties, and interference by reason of inadequate financing but from the time the various wells were brought in down to January 1, 1941, nearly 120,000 barrels of oil were produced at an average production cost of between 12 cents and 13 cents per barrel. This compares favorably with the experience of other leases in the field. The testimony falls far short of proving 'incompetency, neglect of duty, violation of trust, or other cause.'"

Plaintiffs appeal and urge that defendant fraudulently misrepresented the production of the Thurkettle lease to induce the plaintiffs to agree to the drilling of the fifth well; that said well was not a commercial well; that the court was in error in permitting defendant to charge plaintiffs the sum of $4,500 or one-half the cost of drilling and equipping the fifth well; and that there was irreparable dam-

age done to the Thurkettle lease by the drilling of the fifth well.

Upon the issues involved in this claim, the trial court found:

"It is my conclusion that Williams did not represent the production of the lease as stable, and in any event the officers of Kinwell and Minerals knew the exact situation and did not rely upon any statement of Williams when they approved the drilling of the fifth well. Their actions in attempting to withdraw their consent were probably due to the realization that their share of the expense of the fifth well would require their share of the oil run proceeds for a period longer than they had estimated."

The record shows that the Thurkettle lease was approximately a 40-acre tract of land on which four wells had been drilled and completed by December, 1939; that production from these wells was prolific in the beginning and after the so-called flush period, the production commenced its usual decline; and that in October, 1940, defendant proposed the drilling of a fifth well in the center of the lease and to a strata known as the "Monroe formation." The project was discussed by the directors of the companies interested and at first was opposed by them, but later they agreed to the drilling of the well at a cost of $9,000. The well was completed and was a producer, but inasmuch as the production from this well together with the production of the other four wells was commingled, it was impossible to determine its exact flowage.

It is urged by plaintiffs that defendant misrepresented the flowage from the other four wells when they consented to drilling the fifth well; and that as soon as they knew the true facts and before the

well had been drilled, they notified defendant of their withdrawal of consent to its drilling. We are in accord with the finding of the trial court that defendant did not make any representations that induced plaintiffs to consent to the drilling of the wells. It is a fact that production of these four wells fluctuated during the period beginning in April, 1940, and up to the time of the drilling of the fifth well; and it is also true that during this period there was a general decline in the amount of oil produced. This fact must have been known to plaintiffs from the semimonthly checks they received for oil from these wells during the so-called declining months. In *Beverly* v. *Richards,* 255 Mich. 508, we held that fraud is not perpetrated upon one who has full knowledge to the contrary of a representation. In the case at bar defendant Williams was an experienced oil man. He was the managing partner of all interests. His interests in the leases were substantial. Under such circumstances, we think he did not exceed his powers in drilling the well, even though others in interest changed their minds about the drilling. See *Houston & West Texas Oil Co.* v. *Storey* (Tex. Civ. App.), 117 S. W. (2d) 832, and *Bartlett & Stancliff* v. *Boyles,* 66 W. Va. 327 (66 S. E. 474).

It is urged by plaintiffs that the work orders, work tickets, and material transfer slips offered by defendant in the trial of the cause were padded, fabricated and tampered with. A work ticket is a form of labor record. Each employee was supposed to fill out and sign one of these forms for every day he worked. The pay roll records were based on these tickets. A work order is the form upon which the defendant made his charge to his customers. Plaintiffs introduced evidence to the effect that work orders had been padded and in some instances

work tickets were made out by men who actually had not done the work.

In a supplemental opinion filed by the trial court it was said:

"It is true that defendant's office records were faulty and not correct in several respects but some of these shortcomings can be excused by reason of his sickness and enforced absence from his business affairs. That he was not guilty of deliberate fraud and intentional deception is supported by his appointment of Hollopeter, plaintiffs' manager or overseer, with broad powers as attorney in fact from Williams to run the syndicate's business. Hollopeter had the management of both plaintiffs' and defendants' business simultaneously for some time."

As we examine the record we find that there were approximately 2,000 of these work orders and work tickets. The trial court after examining some of them finally concluded:

"For this court to arrive at an exact computation is almost a hopeless task. I am satisfied that the amounts herein reached are not entirely correct. Doubt and suspicion has been cast on many items challenged by plaintiffs. And even plaintiff's counsel could not make an issue of every one of the hundreds of items listed. He could only cull out some and throw a suspicion of doubt on many others."

In determining the amount due defendant under the cross bill filed by him, the court said:

"I think the ends of justice will be served by making a straight reduction of one-third in the balances herein decreed to Williams as owing to him by Michigan Minerals, Kinwell and Fothergill, as follows: Due Williams from Minerals, $4,501.52; from Kinwell $1,687.38; from Fothergill $281.76."

In a later supplemental opinion, the trial court revised these figures to show that Michigan Minerals, Inc., owed Williams the sum of $4,106.05 and Kinwell Oil Company owed Williams the sum of $1,649.01.

The trial court entered a decree in which it is decreed that as of December 31, 1940, Michigan Minerals, Inc., owes Williams the sum of $2,553.17; Kinwell Oil Company owes Williams the sum of $961.39, and H. R. Fothergill owes Williams the sum of $364.74.

In the revision as last made by the trial court we find that the same is based on the following:

|  | "For Michigan Minerals | For Kinwell Company |
|---|---|---|
| Reductions on Kobel-Lawrence equipment | $ 640.23 | $ 213.41 |
| On Bryan equipment | 212.91 | 212.91 |
| Division of Insurance recovery | 102.30 | 34.10 |
| Improper cement charges | 130.50 | 43.50 |
| Improper charge for missing line pipe 1500' | 56.25 | 18.75 |
| Casing shoe charge | 36.93 | 12.31 |
| Rod overcharge (Ex. 409) | 126.90 | 42.30 |
| Rod overcharge (Ex. 360) | 42.08 | 42.08 |
| Improper charge in re first location No. 4 | 131.34 | 43.78 |
| Overcharge on 8″ casing | 73.44 | 24.48 |
| Additional deductions allowed | $1,552.88 | $687.62" |

This court cannot scrutinize every paper, invoice, or work sheet that was introduced in evidence to determine its truth or falsity. We must rely to a great extent upon the findings of fact of the trial court, and this is especially so in cases of this kind. In our opinion, there is evidence to support the finding of facts as finally determined by the trial court. The trial court made as correct a finding of facts as was possible, having in mind the way the cause was presented with its multitude of contested exhibits. We adopt as the basis of this opinion the finding of facts as made by the trial court.

The reasons stated by plaintiffs for the appointment of a receiver are that defendant Williams was incompetent to operate the wells; that he perpetrated a fraud upon plaintiffs; and that the property will be dissipated and irreparable injury done to the same unless a receiver is appointed to conserve it. A court of equity has inherent power to appoint a receiver. See *Grand Rapids Trust Co.* v. *Carpenter,* 229 Mich. 491. The appointment of a receiver is a harsh proceeding and should be resorted to only in extreme cases. See *Jenks* v. *Horton,* 96 Mich. 13.

In *People* v. *Israelite House of David,* 246 Mich. 606, we said:

"It has long been the law in this State that no court has unlimited discretion to put private estates into the hands of receivers; and that the appointment of a receiver is a harsh proceeding, which should be resorted to only in extreme cases."

In *National Lumbermans Bank* v. *Lake Shore Machinery Co.,* 260 Mich. 440, we held that the appointment of a receiver can be made only as

ancillary to other relief sought in the bill of complaint.

The trial court, in denying the appointment of a receiver, stated:

"The appointment of a receiver would necessitate the hiring of operators. Defendant has the equipment and the experienced help. Defendant is as much interested in full production as plaintiffs. He is a substantial owner. This suit must have taught him a lesson which will make for better bookkeeping in the future. * * *

"I am fully persuaded that there should be no receivership because the grounds for receivership are not present. I am satisfied a receiver cannot operate these wells satisfactorily or more economically than defendant. He would be required to hire operators and overseers. The work is of a technical nature. Oil wells can be easily damaged and ruined by careless operation. Williams has not damaged the wells and, according to the record, has brought in all possible production. He has the experienced employees, he has the equipment, he knows these wells, he knows the business, he does this line of work for other well owners. Were he inclined to injure the plaintiffs, he would also injure himself. For his own interest, as part owner, and his wife, who has overriding interest, he desires all production obtainable. His zeal to make his holdings profitable inures to the benefit of the plaintiffs."

We are in agreement with the conclusions of the trial judge in his refusal to appoint a receiver. The record fully satisfies us that Williams is a competent oil man and with competent office help should be able to conduct the business to the satisfaction of all concerned. In coming to this conclusion we are not unmindful of the fact that there is grave doubt in the accuracy of some of the

bookkeeping items presented by defendant, but in considering the whole problem we do not feel that they are of such a serious nature as would warrant the appointment of a receiver. We cannot say that the trial court abused its discretion in refusing to appoint a receiver.

The decree is affirmed, with costs to defendant Williams.

Boyles, C. J., and Chandler, North, Starr, Wiest, Butzel, and Bushnell, JJ., concurred.