PEOPLE *v.* ISRAELITE HOUSE OF DAVID.

1. APPEAL AND ERROR—CHANCERY APPEALS HEARD DE NOVO—DEATH
OF DEFENDANT CHANGES RECORD.

On appeal from a decree abating a public nuisance with injunc-
tive relief incident thereto, the death, since the decree, of one
of the defendants who was inseparably connected with the
facts and circumstances giving rise to said nuisance, results
in the Supreme Court having before it for determination a
different set of facts from that submitted to the court below;
he appeal being heard *de novo.*

2. NUISANCES—IMMORAL PRACTICES—RELIGIOUS SOCIETIES—INJUNC-
TION.

In a suit to abate a public nuisance claimed to be maintained by
a religious association and its leaders, evidence of immoral
practices principally by one of the leaders, *held,* sufficient to
justify a decree of abatement with injunctive relief incident
thereto.

3. RECEIVERS—APPOINTED ONLY IN EXTREME CASES—HARSH REM-
EDY—COURT'S DISCRETION LIMITED.

The appointment of a receiver is a harsh proceeding, which
should only be resorted to in extreme cases, and no court has
unlimited discretion to put private estates into the hands of
receivers.

4. SAME—NUISANCES—STATE NOT PROPER PARTY TO RECEIVERSHIP
SUIT.

In a suit to abate a public nuisance consisting of immoral prac-
tices by the leaders of a religious association, the State has no
right to have a receiver appointed for the association's prop-
erty, even for the purpose of conserving the property rights of
the members and to prevent a multiplicity of suits, since the
State is not properly a party to receivership proceedings, which
should be brought by parties having property interests to be
adjudicated.

Appeal from Berrien; Fead (Louis H.), J., presiding. Submitted October 19, 1928. (Docket No. 52, Calendar No. 33,522.) Decided June 3, 1929. Rehearing denied September 4, 1929.

Bill by the people of the State of Michigan on the relation of Andrew B. Dougherty, Attorney General, against the Israelite House of David and others to abate a nuisance. From a decree granting the relief prayed, defendants appeal. Modified and affirmed.

*Wilber M. Brucker,* Attorney General, *George E. Nichols,* Special Assistant Attorney General, and *George H. Bookwalter,* Prosecuting Attorney, for plaintiff.

*W. J. Barnard,* for part of defendants.

*George S. Foster* and *H. T. Dewhirst* (*J. Hamilton Lewis,* of counsel), for other defendants.

North, C. J. ''This is an action in equity, brought by the attorney general of the State of Michigan, in his official capacity, to abate an alleged public nuisance claimed to be maintained by the defendants.

''The defendant Israelite House of David is a voluntary, unincorporated, religious society, founded and dominated by the defendants Benjamin and Mary Purnell. Claiming to be the Seventh Angel or Messenger mentioned in the Book of Revelation, Benjamin, in 1902, gave to the world a written religious message. On March 17, 1903, he and Mary and five others came to Benton Harbor, Michigan, acquired some property through gift of adherents, set up a colony, and began to spread their gospel. Communism is a tenet of the faith, and each incoming member is required to transfer to the community all his wordly goods. To take and hold title to the community property, and to conduct the temporal

affairs, a religious corporation was organized in 1903, under the laws of the State of Michigan, with the name 'The Israelite House of David, Church of the New Eve, Body of Christ.'

"In the next few years the movement gained considerable headway, both in the number of converts and the acquisition of property. * * * Preachers were sent out to all parts of the United States and to foreign countries, and, through their efforts and the dissemination of the literature (which has been translated into several foreign languages), the colony has grown to some 500 members.

"In addition to its religious work, the House of David is a business institution. It has an extensive and valuable plant, consisting of residence buildings, parks, offices, shops, cottages, hotel, stores, farms, and other properties. * * *

"In 1907 * * * the attorney general of Michigan conducted an investigation of the House of David, finally decided that the corporation was holding and using real estate in excess of its requirements for religious purposes, and, therefore, in violation of its charter. After some negotiations and threat of *quo warranto* proceedings, the corporation, joined by all the original grantor members individually, executed a conveyance of all the property held by the corporation, to Benjamin and Mary Purnell as husband and wife, by ordinary and unconditional warranty deed dated September 30, 1907. This action was approved by the attorney general.

"On January 10, 1919, Benjamin and Mary executed and recorded a declaration of trust, in the following form:

" 'Know all men by these presents that Benjamin and Mary Purnell, husband and wife, of Benton Harbor, Mich., in whose name all property is now held pertaining to the Israelite House of David, a voluntary religious association, of Benton Harbor, Michigan, hereby declare in accord with an understanding with the Israelite House of David, that all

such property now held by them, for the work of the Ingathering of Israel as set forth in the Message published by Benjamin, is for the benefit and support for the members of the Israelite House of David; which means to say, the members that remain now or in the future, loyal and in good standing to the visitation as laid down in the Message of Benjamin's, and which means to convey, loyal to Mary and Benjamin, according to the judgment of Benjamin and Mary as to their standing and loyalty.'

"The testimony does not show the occasion or reason for the execution of this instrument.

"After 1907, the corporation did not function. It was dissolved formally in 1924 by a decree of the circuit court for the county of Ingham, in a *quo warranto* proceeding brought by the attorney general, the decree being by stipulation of counsel and solely upon the ground of nonuser.

"In January, 1908, the present voluntary, unincorporated association was formed, under articles approved by the attorney general after his rejection of articles submitted in December, 1907. The articles and by-laws, with amendments from time to time, and with revised by-laws in 1922, have been filed and recorded in the office of the county clerk of Berrien county and some or all of them with the secretary of State.

"With the growth and prosperity of the colony came also troubles and widespread rumors of misconduct and immorality, particularly as concerned the conduct of Benjamin Purnell. * * * A number of civil suits have been brought against Benjamin and the association, based upon claimed immoralities upon the part of Benjamin. * * *

"On January 13, 1923, two sisters, Gladys Bamford Rubel and Ruth Bamford Reed, former members of the colony, began suit against Benjamin in the circuit court for Berrien county, upon the claim that they had been debauched by him, and sued out writs of *capias,* upon each of which the court set

the bail at $10,000, but they were unable to serve the writs because Benjamin had disappeared.

"After Christmas, 1922, and to avoid service of the Bamford writs of *capias*, Benjamin went into hiding, most of the time remaining in one of the buildings known as the Diamond House. He avoided detection by the officers in two raids in 1923, but was finally discovered and apprehended in a raid by the State police, on November 17, 1926.

"In April, 1923, on petition of the prosecuting attorney of Berrien county, a 'one man grand jury' proceeding * * * was held under the statute, and, later, criminal warrants were issued, charging Benjamin with the crime of statutory rape upon Gladys Bamford Rubel and Ruth Bamford Reed. After his arrest in 1926, Benjamin was further charged with a like offense upon Bessie Daniels Woodworth. In December, 1926, examinations were held and Benjamin was bound over to the circuit court for trial. * * *

"The instant suit was commenced July 3, 1924. * * *

"The cause came on for hearing on May 16, 1927, and occupied 51 days of actual trial, extending over a period of three months. About 225 witnesses were sworn, over 500 exhibits introduced, 73 depositions taken, and the record contains about 15,000 pages of testimony, including the depositions. * * *

"The Major Issues.

"In its bill, the State claims that the defendants are maintaining a public nuisance in four major particulars:

(a) In maintaining a religious system and faith which are *ab initio* fraudulent, in that Benjamin Purnell is a religious imposter and the whole scheme is designed to defraud credulous persons and afford Benjamin an opportunity for immoral practices.

(b) In gross immoralities committed by Benjamin upon the women and girls of the colony, induced by him through his position as spiritual leader and usu-

ally upon the representations that sexual intercourse with him is a religious rite.

(c) In that the members are taught to commit perjury for the protection of Benjamin, the colony and the faith.

(d) In that the members conspired to obstruct justice in aiding Benjamin to avoid the service of criminal process upon him.

## "Minor Issues.

"In addition to the major issues, other charges are made against the defendants which, although not so named in the bill, are of the nature of minor issues:

(a) That home life is frowned upon and families broken up.

(b) That the faith requires celibacy and prohibits the reproduction of the species.

(c) That husbands and wives and parents and children are separated and made to live apart.

(d) That the children do not receive an adequate education.

(e) That disloyalty to the government is taught, and, during the world war, fictitious dependencies were created to mulct the government upon military allowances.

(f) That the members are held in peonage.

(g) That the colony is set up as a kingdom, not subject to civil law.

(h) That the members are forced into marriage to subvert justice and hide crime.

(i) That they are not provided with sufficient food, clothing, and shelter.

(j) That High Island, a possession of the cult in Lake Michigan and off the coast from Charlevoix, is used as a place of punishment and exile.

(k) That Sunday is not observed as a day of rest but is used as a particularly profitable business day.

(l) That the members are required to vote as ordered on penalty of excommunication.

(m) That the property is held by Benjamin and Mary in fraud of the other members and should be declared to be a charitable trust.''

The foregoing is quoted from an exhaustive and carefully prepared opinion of the trial judge covering upwards of 190 pages of printed record, wherein he has presented a review of the facts and issues which is conclusive of the painstaking manner in which the case was tried. While other leading members and officers of the voluntary association were made defendants, the suit was tried practically as though Benjamin Purnell and Mary Purnell were the only defendants, and with Mary Purnell being of decidedly secondary importance in that respect. The prayer for relief is for (1) a dissolution of the voluntary association, (2) the appointment of a receiver, (3) that the property be decreed to be held in trust for members of the association, and (4) for injunctive relief incident to the abatement of the alleged nuisance and relative to property rights. A decree was taken by the plaintiff by which a public nuisance found to exist was abated, the injunctive relief sought was granted, and a receiver was appointed. By its terms the decree indicates that the receiver was appointed as a conservator of the property involved and as an instrumentality through which the injunctive relief granted might be made effective and further fraud prevented, but not in contemplation of dissolution of the association. The defendants have appealed.

The decree herein was filed December 5, 1927. Benjamin Purnell died December 16, 1927. The appeal was subsequently submitted to this court. Appeals in chancery are heard *de novo,* and this results in the instant case in this court having before it for determination a 'set of facts which, because of the

death of Benjamin Purnell, is entirely different than that submitted to the trial court. The plaintiff's whole case rested upon the alleged existence of a public nuisance, for which the defendants were alleged to have been responsible. The primary relief sought was the abatement of this nuisance, the other relief sought being in the main only incidental thereto. The facts and circumstances giving rise to the alleged public nuisance were almost inseparably connected with the life of Benjamin Purnell. Because of his death we find it unnecessary to review much of the record presented to the lower court or to determine whether the relief there granted was fully justified by the facts and circumstances as they then existed. Reference to the four major issues, hereinbefore quoted from the opinion of the trial judge, discloses that the whole case in its major aspects is centered about Benjamin. It is true that the other defendants may attempt to continue the religious system and faith adopted by them and their followers. But the circuit judge fittingly stated in his opinion:

"This ruling does not, of course, 'take up matters of religious doctrine for the purpose of determining the abstract truth or falsity thereof.' It concerns only property rights, which are under control of the State, and neither prevents the members of the House of David from continuing, nor any one else from commencing, to accept Benjamin as the seventh messenger. Nor does it interfere with liberty of belief nor the orderly and lawful expression of religious discipline and practice."

It was the abuse by Benjamin Purnell of the opportunities afforded to him by the religious belief of this sect which was mainly responsible for the charge that a public nuisance existed. The alleged

fraud perpetrated under the guise of religion, the practice of gross immoralities, the teaching of perjury and the obstruction of justice came into existence and characterized the conduct of the members of the defendant organization for the most part only so far as these activities suited the personal pleasure or served the individual needs of the now deceased leader of the sect. By the death of Benjamin Purnell the alleged public nuisance in these particular was largely minimized; and so far as Benjamin Purnell is concerned, there is now no need of a decretal order of this court.

One cannot read this record without being convinced of two facts: *First,* That the condition alleged and proven constituted such a menace to public morals and welfare as to be a public nuisance of the character outlined in paragraphs (b) and (c) of "the major issues" above quoted; and, *second,* that not only Benjamin Purnell, but also other officers and members of the Israelite House of David, to some extent, were instrumental in creating and perpetuating the conditions which constituted this nuisance. For this reason the decree entered in the circuit granting injunctive relief in the abatement of such nuisance must be affirmed to the extent hereinafter indicated.

In addition to the four major issues to which reference has been made, 13 other matters of controversy above quoted were grouped and referred to by the trial judge as "the minor issues." With the one exception of the property rights of the parties, which we will presently consider, these so-called minor issues may be disposed of somewhat summarily because of the fact that, in so far as they are established by the proof, they are either so inseparably connected with the personal misconduct of Ben-

jamin as to have been terminated by his death, or are so remote in point of time or so inconsequential that they have little bearing, if any, upon the plaintiff's right to the relief claimed upon the ground of an alleged public nuisance.

In making a disposition of property rights, by the decree entered in the circuit, Benjamin and Mary Purnell were held to have title to a large amount of property "in fraud of the members and former members of said Israelite House of David," and Benjamin and Mary were ordered to convey this property to the receiver appointed by the court. It is urged by some of the defendants that the trial judge was in error in determining that this is a proper proceeding in which to adjudicate the controversy as to the ownership of the property accumulated incident to the growth and development of this voluntary religious association, and in holding that claims arising out of frauds perpetrated on the present or former members might be litigated in this suit brought by the State of Michigan for the abatement of a nuisance. As hereinbefore stated, in 1907 when *quo warranto* proceedings were threatened on the ground that the incorporated religious body was holding and using its property for other than religious purposes, the original grantor members joined with the corporation in a conveyance of all of its real estate by warranty deed to Benjamin and Mary Purnell. Title to this property has continued to be so held; but in 1919 Benjamin and Mary executed the declaration of trust already quoted wherein it is set forth:

"That all such property now held by them    *    *    * is for the benefit and support for the members of the Israelite House of David; which means to say, the members that remain now or in the future, loyal and in good standing, etc."

Previous to making this declaration of trust, and in 1914, books of instructions to the members were printed and distributed and the following, referring to the property having been deeded to Benjamin and Mary Purnell, is quoted therefrom:

"Yet, this did not do away with the fact that the property and all possessions belonged to the members of the House of David, and especially those who gave in and worked for the commonwealth, and therefore Benjamin and Mary simply hold it yet for the House of David and its members, etc."

The contention of the people is that the State has such an interest in the past and present members of this voluntary association that it should protect such rights as these individuals may have, and that the whole of the property should be decreed to be held in trust for the use and benefit of these members. It is urged that by this method only can the rights of the members in the property be conserved and many of them saved from becoming public charges; and that otherwise the property will be dissipated in litigation resulting from a multiplicity of costly law suits. The plaintiff's contention is that equity having acquired jurisdiction full relief should be rendered, and if necessary, a receiver or conservator of the property should be appointed by the court to assist in attaining the ends of justice. The defendants are not in accord as to this phase of the case. Some of them would have the property held in trust for the purposes of the association, but others assert that by deed Mary Purnell is the owner of one-half of the property in her own right. The further contention is made by at least a part of the defendants that the property rights of these respective parties cannot be adjudicated in this suit brought by the State for the purpose of abating a nuisance. The

question of first importance is whether this issue of property rights is properly before the court for adjudication, and incidentally whether the appointment of a receiver is justified.

It must be borne in mind, as above stated, that the primary purpose of this suit by the State is the abatement of a public nuisance. None of the grantors of the property claimed to have been obtained through fraud are parties plaintiff or parties defendant asking affirmative relief; nor are the particulars of any alleged frauds set forth in the pleadings. There are upwards of 130 of these grantors, and any or all of them might, if they saw fit, waive the fraud if one was in fact perpetrated upon them. Notwithstanding it is possible that numerous suits may result, none the less we are of the opinion that the usual orderly procedure should be resorted to by any person or persons claiming to have a cause of action involving property rights against this association or by the association as to rights it might claim to have against others. We know of no authority which would justify the State in attempting to intervene and in a paternalistic way by means of a receivership work out collectively the various conflicting claims of the defendants. Especially is this true since the decree taken expressly provides that it does not "contemplate the dissolution of the voluntary association known as the Israelite House of David unless said association shall be unable or unwilling to carry on the temporal affairs of said association." The State had no right to institute this litigation for the purpose of securing an adjudication of issues in which it had no apparent interest, unless it can be justified in having done so on the theory that incident to the abatement of the existing nuisance it was necessary to take possession at least temporarily of

the property belonging to the defendants. While the proof conclusively justifies that portion of the decree which goes to the elimination of a condition so intolerably immoral that its abatement was imperative, and incident thereto granted injunctive relief; nevertheless a careful consideration of this voluminous record satisfies us that under the changed conditions brought about by the death of Benjamin Purnell this court would not be justified in dispossessing these defendants or any of them of any property or property rights they may have on the theory that it was done incidental to the abatement of the nuisance. We are mindful of the fact that when circumstances so require, a receiver may be appointed to aid in rendering effective the injunctive relief granted by the court; but the injunctive relief is adequate for the existing needs of this case, and under such conditions a receiver should not be appointed. 34 Cyc. p. 25. It has long been the law in this State that no court has unlimited discretion to put private estates into the hands of receivers; and that the appointment of a receiver is a harsh proceeding, which should only be resorted to in extreme cases. *Barry* v. *Briggs,* 22 Mich. 201; *Jenks* v. *Horton,* 96 Mich. 13. In stressing the importance of the part which Benjamin Purnell had to do with the subject-matter of this litigation, we are in full accord with the opinion filed by the circuit judge wherein he stated:

"It must not be forgotten that the evils complained of are caused by Benjamin's conduct, etc. * * * Some sort of temporal supervision by the court, in aid of a proper injunction, would seem to be necessary to effectuate the abatement of the nuisance of immorality and perjury, at least as long as Benjamin's capacity for misconduct may continue and he have control over the destinies of his people, etc."

As the case is now presented to us, we must hold that the appointment of a receiver is not necessary to render effective the decree of the court in abating the nuisance; and that, other than on this theory, the State has no right to have a receiver appointed, nor is it a proper party plaintiff to institute litigation in which conflicting property claims of these defendants are to be adjudicated.

The appellants have presented and urge the claim that the bill of complaint should be dismissed for reasons set up in support of a motion to dismiss which was made in the circuit court and there denied. The questions thus raised involve the jurisdiction of the circuit court of Berrien county, the right of the attorney general to institute this suit, the right of the plaintiff to amend the bill of complaint, and other issues which we need not set forth in detail. We are of the opinion that the motion was properly denied.

The decree entered in the circuit court is affirmed to the extent that injunctive relief was granted incident to the abatement of the nuisance excepting that portion thereof whereby Mary Purnell is enjoined from going upon the premises of the association or participating in the management of its affairs as provided in paragraphs two and four of said decree. The other provisions of the decree must be vacated. Because of the modification of the decree as herein provided, no costs will be awarded in this court.

Fellows, Wiest, Clark, McDonald, and Sharpe, JJ., concurred. Fead and Potter, JJ., did not sit.