Emily BLUME et al., Plaintiffs,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 3934.

United States District Court
W. D. Michigan, S. D.

Dec. 19, 1966.

Stephen T. Roumell, New Buffalo, Mich., for plaintiffs.

Harold D. Beaton, U. S. Atty. for Western District of Michigan, Grand Rapids, Mich., for defendant.

## OPINION

STARR, Senior Judge.

Plaintiffs, who are members of the Israelite House of David, a religious organization, bring this action in pursuance

of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a decision of the Appeals Council of the Social Security Administration, which held (1) that they were not entitled to old-age insurance benefits under the Social Security Act as amended, 42 U.S.C. § 301 et seq.; and (2) that certain amounts paid to them during the years 1954 to 1958 as old-age benefits were erroneously paid, and that the United States should recover such amounts from them. These amounts had previously been determined by the department's hearing examiner (formerly referee).

To determine the questions presented in this civil action, it is necessary to set forth in some detail the history of the Israelite House of David and the claims presented and action taken by plaintiffs under the Social Security Act before the Secretary of Health, Education and Welfare.

The Israelite House of David, herein referred to as the association, was founded by Benjamin Franklin Purnell and his wife Mary in 1903. In that year Benjamin, who claimed to be the Seventh Angel or Messenger mentioned in the Book of Revelation (Rev. ch. 10), and his wife and five others came to Benton Harbor, Michigan, acquired some property through gift of adherents, set up a colony, and began to spread their gospel. Each incoming member was required to transfer to the community all his worldly goods. People v. Israelite House of David, 246 Mich. 606, 225 N.W. 638.

To take and hold title to the community property and to conduct the temporal affairs of the colony, a religious corporation was organized in 1903 under the laws of Michigan with the name, "Israelite House of David, Church of the New Eve, Body of Christ." Thereafter the association acquired extensive and valuable properties consisting of residence buildings, parks, offices, shops, cottages, hotel, stores, farms, and other properties, and paid corporate taxes on its income. People v. Israelite House of David, supra.

In 1907, after an investigation, the attorney general of Michigan concluded that the association's real-estate holdings exceeded its requirements for religious purposes and therefore constituted a violation of its charter. That same year after some negotiations the corporation, together with all the original grantor members, and with the approval of the attorney general, conveyed all the corporate property to Benjamin and Mary Purnell as husband and wife. Thereafter the corporation did not function and was dissolved by court decree on the ground of nonuser.

In 1908 the Israelite House of David was organized as a voluntary religious association under articles of association approved by the attorney general of the State, and subsequently Benjamin and Mary Purnell executed a declaration of trust providing that all the property which they had received and held for the association was for the benefit and support of its members. The association grew and prospered, but eventually rumors became widespread of misconduct and immorality by Benjamin Purnell, and this resulted in a grand-jury investigation of Purnell and the association. An action was also begun by the State of Michigan in 1924 to abate an alleged public nuisance claimed to be maintained by the association. Following trial of this action the circuit court entered a decree finding that a public nuisance existed, which it ordered abated, and appointing a receiver to operate the properties of the association.

The decree of the circuit court was filed December 5, 1927, and 11 days later Benjamin Purnell died. On June 3, 1929, the Supreme Court of Michigan affirmed the decree of the circuit court insofar as it abated and enjoined the maintenance of a nuisance, but vacated the provisions of the decree which appointed a receiver of the property and which enjoined Mary Purnell from going on the premises and participating in the management of association affairs.

In 1930 Mary and 215 of her followers elected to leave the association and, pur-

suant to an agreement between the two factions, the circuit court entered a decree partitioning the property of the association and conveying one part to Mary Purnell, trustee, and the other part to the Israelite House of David and its members. The decree provided that trustees should hold all of the property conveyed to the House of David for the use and benefit of the members of the association in accordance with its membership contract and by-laws. The officers of the association were called "pillars" and the by-laws were amended to vest in the pillars all of the powers previously held by Benjamin Purnell. The pillars were given complete power to manage and control all affairs of the association, including the acquiring, encumbering, and disposing of the property of the association.

The plaintiffs in this case, who are members of the association, practice a communal way of life, giving all of their property and possessions to the association upon joining it, and thereafter receiving all of their sustenance from the association, including food, clothing, shelter, medical care, and other needs. The association owns and operates various businesses and hires many nonmember employees, who are paid wages and on whom social security taxes are paid. Many, but not all, of the members of the association are engaged in the operation of the association's enterprises, and there is no requirement that members do so. Working members contribute their labor but do not receive any pay for their work. All members receive the same benefits regardless of whether or not they work in the enterprises of the association.

Prior to 1939 the Israelite House of David was treated by the Internal Revenue Service as an association taxable as a corporation, but in April, 1939, a ruling was made holding it to be a voluntary religious association, exempt from Federal income tax under § 101(18) of the Internal Revenue Code of 1939 (now § 501(d) of the Internal Revenue Code of 1954), and thereafter the association paid no income taxes. On July 19, 1939, the Internal Revenue Service advised the association by letter that it had been determined that members of the association were employees of the association, that they received "wages" in the amount of the maintenance they received, which were subject to taxes under the Social Security Act. On September 27, 1939, the association was again notified by the Internal Revenue Service that it was obligated to pay social security taxes as the employer of its members, and between 1939 and 1941 upon the basis of this ruling the association filed returns and paid social security taxes on the amount of maintenance its members received for their services. These amounts were duly entered as wages on the records of the Social Security Administration. Between 1939 and 1941 the association also filed claims for refund of the taxes paid, which refund claims were denied by the Internal Revenue Service. In 1944 the association began an action in this district court to recover taxes paid for the years 1938 through 1941. In that case the late Judge Fred M. Raymond held that "the food, clothing, shelter and medical attention furnished the members rendering services for plaintiff do not constitute wages for federal employment tax purposes," and a judgment was entered for the association for the amount of taxes which it had paid together with interest. Israelite House of David v. United States, D.C., 58 F.Supp. 862, 864. It appears from the record of the original hearing before a hearing examiner in 1959 that following the entry of this judgment, a certificate of overassessment was issued by the Internal Revenue Service, which stated that it was "issued in settlement of a judgment for the recovery of taxes paid * * * for the periods from 1 January 1938 through 31 December 1941." The record, however, shows that the period actually covered by this refund was January 1, 1937, through September 30, 1939, and January 1, 1941, through March 31, 1941. Subsequently, upon application by the association, it received refunds for the taxes paid for the second and fourth calendar quarters in 1941 and all quarters in 1942

and 1943 and the first three quarters in 1944. However, the Secretary of Health, Education and Welfare was not a party to the above district-court action, and apparently the Internal Revenue Service never notified him of the judgment and refunds so that he could correct his records and delete the amounts credited to the plaintiffs' earnings records during the period January 1, 1937, through September 30, 1944. No taxes were paid by the association for quarters after the third quarter in 1944.

In 1954 the attorney for the association inquired of a representative of the Bureau of Old-Age and Survivors Insurance regarding the eligibility to benefits of members of the association and was advised that the members would not be eligible to benefits as this court had determined in Israelite House of David v. United States, supra, that they were not employees of the association and did not receive wages for their work. However, at various times during 1955 and 1956 members filed applications for old-age insurance benefits and the bureau determined that an insured status existed in each case, since "wages" reported by the association for its members during the period January 1, 1937, through September 30, 1944, had never been deleted from their earnings records. Beginning on various dates in 1955 and 1956 benefits were paid to plaintiffs (see Appendix A attached to this opinion). The record indicates that in August, 1956, as the result of inquiry on behalf of plaintiffs regarding an earlier filing date, the bureau began an investigation of the amounts credited to their earnings records, and in March, 1958, determined that all earnings reported to the members' accounts by the association subsequent to 1937 should be deleted from their earnings records. The bureau also determined that amounts credited on the earnings records for 1937 could not be deleted due to expiration of the time limitation after that year. However, all "wages" reported by the association subsequent to 1937 were deleted from the plaintiffs' wage records. They were advised in

April, 1958, that they no longer had an insured status, that they had been overpaid various · amounts, and that they should refund the overpayments.

On May 29, 1958, plaintiffs filed requests for a hearing on the bureau's determination that they were not entitled to benefits and that they should refund the amounts they had received, and on February 10, 1959, a hearing was held by a hearing examiner. On March 3d the examiner filed his recommended decision that plaintiffs were not entitled to any quarters of coverage under the Social Security Act based upon wages paid to them after 1937 by the Israelite House of David and that recovery of any overpayments made to them should not be waived. Plaintiffs' request for review of this decision was granted by the Appeals Council and a hearing was held on October 13, 1959. On June 15, 1960, the Appeals Council filed its opinion holding that the plaintiffs were not insured and were not entitled to the benefits for which they had filed applications, and that they had been overpaid in the amounts theretofore determined by the bureau. The Appeals Council further held that the recovery of overpayments made to the plaintiffs could not be waived by the United States.

On August 12, 1960, plaintiffs began this action to review the decision of the Appeals Council. They subsequently moved to amend their complaint so as to assert their status as self-employed persons and to remand the case to the Secretary of Health, Education and .Welfare for the presentation of additional evidence relating to their eligibility for benefits. Folowing a hearing the court remanded the action to the Secretary for the purpose of taking further testimony and the determination of the rights of the plaintiffs to benefits as self-employed persons.

Pursuant to the court's order a hearing examiner conducted a supplemental hearing on May 28, 1963, and following the hearing filed his recommended decision that each of the plaintiffs "be held not entitled to the old-age insurance benefits requested in the applications which

they filed in 1955 and 1956, and in the applications filed by them or in their behalf in 1960." Upon review the Appeals Council filed decision on December 31, 1963, adopting the hearing examiner's "findings, inferences and conclusions as set forth in his recommended decision" and overruling plaintiffs' objections. In his decision, which was approved and adopted by the Appeals Council, the hearing examiner made the following findings:

(1) "That the Association (House of David) is (for tax purposes) a corporation within the meaning of Sections 7701(a) (2) and (3) and 761(a) of the Revenue Code; that the income here involved was that of the Association for tax purposes and was not derived from any trade or business engaged in by the claimants; and that no part of such income constituted net earnings from self-employment."

(2) "That the claimants' pro rata shares of the Association's income for the years involved constituted dividends which, under Section 211(a) (2), were not includable in computing net earnings from self-employment, and thus did not result in quarters of coverage."

(3) "That the claimants did not acquire net earnings from self-employment in the relevant years by reason of waiver certificates electing Social Security coverage pursuant to Section 211 (c) of the Act."

(4) "That the Act permits revision of the 1955 earnings record of each claimant, and of the earnings record of each claimant for 1957, 1958, 1959, and 1960."[1]

In their original complaint the plaintiffs allege that the decision of the hearing examiner and the Appeals Council that they are not entitled to old-age benefits under the Social Security Act is erroneous, and assert as errors the following: (1) That the hearing examiner and the Appeals Council erred as a matter of law in reopening the initial determination of the Bureau of Old-Age and Survivors Insurance that plaintiffs were entitled to old-age benefits; (2) that the Secretary acted in violation of § 205(c) (5) of the Social Security Act in deleting from the wage records of plaintiffs wages previously credited to them; and (3) that, having determined between April, 1955, and November 1, 1956, that plaintiffs were entitled to benefits, the Secretary cannot now reopen and reconsider his determination of entitlement.

Plaintiffs later amended their complaint to assert the further claim that they are self-employed persons, that they have filed self-employment returns required under the Social Security Act, and that they are entitled to a number of quarters of insurance coverage by reason of their self-employment status and the payment of taxes. They allege that at various times during 1955 and 1956 they filed applications for old-age insurance benefits and that benefits were granted and paid to them by the Bureau of Old-Age and Survivors Insurance, but that during 1958 the bureau suspended payments of benefits and on April 4th of that year advised them that they were not entitled to benefits. Therefore, they further ask that in the event the court finds that certain deletions on the plaintiffs' wage records made by the Secretary pursuant to the decision of the Appeals Council are legal, the court order that any old-age insurance benefits heretofore paid to the plaintiffs be forgiven and that they not be required to repay such sums.

In his answer the defendant admits that plaintiffs had filed applications for old-age benefits under the Act and had initially been awarded benefits by the Bureau of Old-Age and Survivors Insurance, and that thereafter the bureau determined that plaintiffs were not entitled to benefits and reversed the awards

---

[1]. The record indicates that "the claimants did not allege creditable net earnings for the year 1956 since the pro rata shares for that year did not amount to at least $400."

and requested that the overpayments be refunded. The defendant contends that the findings and conclusions of the Appeals Council are supported by substantial evidence and are conclusive, and asks that judgment be entered affirming the decision of the Appeals Council and dismissing the plaintiffs' complaint. On July 23, 1964, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendant filed motion for summary judgment in his favor, and on July 29th plaintiffs also filed a motion for summary judgment in their favor.

The present civil action is to review a final decision of the Appeals Council of the Social Security Administration, and under 42 U.S.C. § 405(g) the court may consider the pleadings filed and the transcript of the record of all proceedings before the Secretary of Health, Education and Welfare, and shall enter a judgment "affirming, modifying, or reversing the decision of the Secretary," and "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive."

■ The plaintiffs' first claim is based upon the fact that in 1955 and 1956 they filed applications for old-age insurance benefits under the Social Security Act and were found to be entitled to benefits but that subsequently the Secretary of Health, Education and Welfare reopened the question of their eligibility and determined that they were not eligible to benefits and discontinued payments to them. Plaintiffs allege that the Secretary's action in denying them eligibility was based on his erroneous decision that all earnings reported to their accounts by the association subsequent to 1939 should be removed from their earnings records.

Sections 404.957 and 404.958 of Regulations No. 4 of the Social Security Administration (20 CFR 404.957, 404.958, 42 U.S.C. App.) provide that an initial or reconsidered determination of the Secretary, which is otherwise final, may be reopened "within 4 years after the date of the notice of the initial determination to the party to such determination, upon a finding of good cause for reopening such determination." Good cause is deemed to exist where "new and material evidence is furnished after notice to the party to the initial determination." In its decision of June 15, 1960, the Appeals Council held as follows:

"Clearly within four years of the date the earliest application was filed by a claimant, there was furnished and came into the possession of the Bureau (of Old-Age and Survivors' Insurance) substantial evidence raising questions as to the correctness of the Bureau's initial determination that the claimants were entitled to monthly benefits. This evidence was new and material to the entitlement of the claimants, and constitutes 'good cause' for a reopening of the question of the claimants' entitlement."

The court concludes that this decision of the Appeals Council was correct and affirms the decision.

■ Plaintiffs further claim that the hearing examiner and the Appeals Council erred in holding that the Secretary could delete from their earnings records wages previously credited to them. In its 1960 decision the Appeals Council held that the plaintiffs' earnings records should be corrected for all periods for which tax refunds had been made to the association. In its opinion the Appeals Council said:

"The refund of taxes paid on 'wage' amounts has the practical effect of voiding the tax returns on which the 'wage' amounts were reported. The 'wage' items on such returns cease to exist as an entry of earnings in the Secretary's records. The fact that action may have been taken without regard to the deletion of such amounts and the correction of such records does not prevent the later correction of such action within the time allowed therefor by the regulations. The payment of benefits to beneficiaries under the Act is predicated upon the payment into the trust fund of taxes on wages paid

an employee, which wages are the basis of the amounts paid as benefits. To permit a claimant to receive a refund of taxes paid on 'wages' reported and to then pay such claimant monthly benefits based on the same 'wage' amounts, would be contrary to provisions of the Act relating to such specific circumstances."

Section 205(c) (5) of the Social Security Act, 42 U.S.C. § 405(c) (5), provides:

"After the expiration of the time limitation following any year in which wages were paid or alleged to have been paid to, or self-employment income was derived or alleged to have been derived by, an individual, the Secretary may change or delete any entry with respect to wages or self-employment income in his records of such year for such individual or include in his records of such year for such individual any omitted item of wages or self-employment income but only—* * *

"(F) to conform his records to—

"(i) tax returns or portions thereof (including information returns and other written statements) filed with the Commissioner of Internal Revenue under title VIII of the Social Security Act."

In its 1960 decision the Appeals Council further said:

"This section of the Act authorizes revision of entries to earnings records after the expiration of the time limitation to conform the Bureau's records ' * * * to tax returns or portions thereof (including information returns and other written statements) filed with the Commissioner of Internal Revenue. * * * ' "

"The record now affirmatively shows, the claimants through counsel agree, and the Appeals Council finds, that the Colony received full refund from Internal Revenue Service of all taxes paid on 'wage' amounts reported by the Colony for the wage earners for the periods January 1, 1937 through September 30, 1939, January 1, 1941

through June 30, 1941, and October 1, 1941 through September 30, 1944, except the amounts reported for quarters in 1942 on the supplemented report included with the timely return for the first quarter in 1943. * * *

"It is the finding of the Appeals Council that the refund of tax claims filed by the Colony and approved by the United States District Court and by the Internal Revenue Service constitute 'written statements' within the meaning of section 205(c) (5) (F) of the Act and that on the basis of such 'written statements' the 'wages' reported by the Colony to the earnings records of the 'wage earners' for the periods January 1, 1937 through September 30, 1939, January 1, 1941 through June 30, 1941, and October 1, 1941 through September 30, 1944, except the 'supplemental' amounts reported for 1942, be deleted from the Secretary's records."

On the other hand, the Appeals Council further held that in the case of certain tax-refund claims made by the association which were denied by Internal Revenue, the "wages" reported for those periods could not be deleted from the Secretary's records but would remain to the credit of the plaintiffs.

The court agrees with these decisions of the Appeals Council and affirms its holding.

The plaintiffs' final claim on this review is that they are self-employed individuals, that they have filed self-employment tax returns under the Social Security Act and paid taxes for the years 1955 to 1960, and that they are entitled to a number of quarters of coverage by reason of their self-employment status and payment of taxes. In support of this they contend that the association, the Israelite House of David, is a partnership for tax purposes and that they are partners with the other members in the production of the income of the association; that such income was derived from trades or businesses; that their pro rata shares of such income constituted net

earnings to them from self-employment; and that they accordingly acquired sufficient quarters of coverage to give them a fully insured status at some time during the years 1955 to 1960.

In his recommended decision filed July 29, 1963, which was approved and adopted by the Appeals Council, the hearing examiner held that for tax purposes the Israelite House of David is a corporation within the definition of the Internal Revenue Code; that the income of the association was not derived from any trade or business engaged in by the plaintiffs; and that no part of such income constituted earnings by plaintiffs from self-employment and thus did not result in quarters of coverage.

Section 211(d) of the Social Security Act, 42 U.S.C. § 411(d), provides that "the term 'partnership' and the term 'partner' shall have the same meaning" as when used in the Internal Revenue Code, 26 U.S.C. §§ 761(a), 7701(a) (2). Those sections are practically identical, and § 7701(a) (2) provides:

"The term 'partnership' includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title a trust or estate or a corporation."

Section 7701(a) (3) of the Code provides that "the term 'corporation' includes associations."

In support of their contention that the House of David is a partnership plaintiffs allege that in 1955 it was notified by the Internal Revenue Service that, as an association exempt from corporate taxes, it should file a return on Form 1065, which is a form of partnership return. Section 1.6033–1(a) (5) (i) of the Regulations of the Internal Revenue Service, 26 CFR 1.6033–1(a) (5) (i), provides:

"Every religious or apostolic association or corporation described in section 501(d) which is exempt from taxation under section 501(a) shall file a return on Form 1065 for each taxable year, stating specifically the items of gross income and deductions, and its taxable income. There shall be attached to the return as a part thereof a statement showing the name and address of each member of the association or corporation and the amount of his distributive share of the taxable income of the association or corporation for such year."

Section 501 of the Code provides:

"(a) An organization described in subsection * * * (d) * * * shall be exempt from taxation under this subtitle. * * *

"(d) The following organizations are referred to in subsection (a): Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire pro rata shares, whether distributed or not, of the taxable income of the association or corporation for such year. Any amount so included in the gross income of a member shall be treated as a dividend received."

Thus, § 501(d) of the Code exempts the association from taxation but requires the members to include in their returns their pro rata shares, whether distributed or not, of the taxable income of the association for each year and provides that such income shall be treated as a "dividend received." As the statute, 26 U.S.C. § 6033, requires an association described in § 501(d) which is exempt from taxation under § 501(a), to file an informational return disclosing information similar to that required of a partnership, the same form (1065) is used by both partnerships, and associations described in § 501(d). It seems clear that the mere requirement that the association file an informational return on a form which is designated as a partnership

form does not impart the status of a partnership to such an association and is not determinative of the question as to whether or not the association is a partnership.

Plaintiffs further allege that in his opinion in the prior action in this court Judge Raymond held that "the plaintiff has a common treasury" (58 F.Supp. 863) and that "all of the property and all of the profit of the various business enterprises are kept as a common fund for the use and benefit of all members" (58 F.Supp. 864), and they contend that under these facts the House of David is not a corporate entity but a partnership and that they are partners in the trades and businesses conducted by the association. However, in that case the court did not find it necessary to determine the question as to whether the association was a corporation or partnership within the meaning of the Internal Revenue Code. It merely decided that the support received by the members did not constitute wages for Federal employment-tax purposes and that the association was entitled to recover social security taxes paid thereon. In that case the court did not inquire into whether the House of David should be considered as an association taxable as a corporation or whether its members might be considered as self-employed. In fact, that decision antedated by several years amendments to the Social Security Act giving coverage to self-employed persons. Judge Raymond's holding in the House of David case is not determinative of the question in the present case as to whether the association is a partnership within the meaning of the Social Security Act and Internal Revenue Code.

■ The general guide lines supplied by the courts in determining whether an organization is to be treated as a corporation under § 7701(a) of the Internal Revenue Code are: (1) Association of individuals in the operation of a business for profit; (2) continuity of life of the organization; (3) centralization of management; and (4) limited liability of members. Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 351, 352, 359, 56 S.Ct. 289, 80 L.Ed. 263. The first of these characteristics is, of course, common to both corporations and partnerships. The remaining three are characteristics which distinguish the two types of entities. The House of David possesses the salient features of a corporation. Although it is a religious association, its members have also associated to engage in business for profit through a business institution. It cannot be denied that the association has continuity of life. Unlike a partnership, the existence of which is interrupted whenever a partner dies or a new partner is added, the association has continued to exist and to operate independently of any change in membership. The record further shows that the management of association affairs has always been highly centralized. The authority for managing, controlling, and directing the association's activities is vested in officers known as pillars, who are empowered to fill any vacancy in their number. The pillars are further authorized to acquire, encumber or dispose of the properties held by the association. The pillars, therefore, bear a marked similarity to a corporate board of directors in that they provide the same kind of centralized control and management as that found in corporations. The pillars have the same authority to direct the day-to-day business of the House of David, free from the interference of the members, as a board of directors enjoys in managing corporate affairs. In both the House of David and in ordinary corporations real authority is vested in a small group of individuals acting in a representative capacity, rather than in the large, cumbersome group of members or stockholders.

Further similarity to the corporate structure is found in the fact that the liability of a member of the House of David extends only to the property which he has contributed to that organization. Like a stockholder 'in a corporation, the member cannot be held liable for any

debts incurred by the association. In addition, the individual member, like a stockholder, is not considered to be an agent of the House of David and cannot bind that association. This situation contrasts markedly with that of a true partnership, where each partner is considered to be an agent of the other partners and may bind the partnership by his acts. In Poplar Bluff Printing Co. v. Commissioner of Internal Revenue, 8 Cir., 149 F.2d 1016, the court held that a particular organization, which was previously a corporation and was thereafter reorganized as a professed partnership, was an "association" within the meaning of the Internal Revenue Code. The court said at page 1019:

"In an ordinary co-partnership each partner represents his fellows, and within the scope of the common enterprise may by his acts impose liability upon them. When, however, the associates so organize themselves that no representative action may normally be taken except by elected officials, the association has taken on qualities of a corporation, as distinguished from a co-partnership. Under the agreement here considered, the individual associate did not represent his fellows and it was not contemplated that his acts would impose liability upon his associates. This could only be done by the managing executive."

Moreover, unlike a partnership contract, the association's bylaws can be and have been amended by less than unanimous agreement of the members. In Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659, the court said:

"The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case (Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670), but whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise."

See also Morrissey v. C. I. R., 296 U.S. 344, 351, 352, 56 S.Ct. 289, 80 L.Ed. 263; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278.

The Israelite House of David was not conducted like a business partnership. Capital accounts for the members were not maintained, so that it would be impossible to ascertain the interest or equity of an individual in the association. There was no distribution of accumulated profits of the association, and the maintenance and support supplied a member bore no relation to the value of the property he donated to the association or to the services he volunteered. The testimony shows that the House of David has never represented itself as being a partnership and has never conducted itself in any way which would indicate to outsiders or members that it was a partnership.

From testimony before the hearing examiner it is clear that new members of the House of David were not informed and did not understand that they were joining a partnership. Members were always aware that they owned no part of the assets of the association, that they relinquished all rights to the property they had contributed to the association, and that should they leave, they would have no right or claim to any property. This is substantiated by the testimony of a member, who was questioned by the hearing examiner as to what her understanding was at the time she became a member of the association. She testified as follows:

"Hearing Examiner: Miss Blackburn, do you consider yourself to be a

co-partner with the other members of the Colony?

"A. I consider myself to be a tenant in common. * * *

"Q. What is a tenant in common in your opinion?

"A. Well, we all share alike.

"Q. Share what alike?

"A. Share the assets of the voluntary association.

"Q. How do you mean share the assets?

"A. I mean we all own * * * the assets between us—all the members. I'm just one of the members.

"Q. Do you consider that you have the power to do something with your share of the assets?

"A. No, I do not.

"Q. Well, what does your ownership, in your opinion, consist of? What rights does it give you?

"A. Oh, it just gives me the right of housing, clothing, just all my needs.

"Q. Do you have any idea what your share of the assets amounts to?

"A. No I don't. * * *

"Q. Well, now, when you signed * * * the form contract that's in the record, * * * did you have any idea at that time that you were becoming a tenant in common?

"A. Well, I just knew that I was one of the members.

"Q. Was it your thought that you would be earning any profit?

"A. No, not at all.

"Q. Do you consider now that you're earning profit?

"A. Well, just for income tax purposes, a pro rata share. * * * I earn my living for all my service."

Another member testified:

"Q. Did you understand the business arrangement that was involved?

"A. No, I didn't know anything about the business arrangement that was involved.

"Q. In other words, you didn't have any intention of becoming a partner, I take it, in some partnership?

"A. Well, as I said before, we just came from a spiritual standpoint because we knew and realized and knew it was according to the scripture and we joined from a spiritual and faith standpoint. * * *

"Q. The thought of profit never crossed your mind?

"A. No, no. It was strictly from a spiritual standpoint."

A third member testified:

"Q. Do you consider yourself a partner with the other members?

"A. I certainly do. Well, not a partner, I'm a member of one big family. We live as brothers and sisters. We all share alike."

In their brief plaintiffs also contend that the court should examine the law of the State of Michigan, under which the association was created, to determine its type of entity. This question was considered and determined by the Supreme Court of the United States in Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670. In that case the court said at pages 287, 288 of 327 U.S., at page 536 of 66 S.Ct.:

"Respondent contends that the partnership arrangement here in question would have been valid under Michigan law and argues that the Tax Court should consequently have held it valid for tax purposes also. But the Tax Court in making a final authoritative finding on the question whether this was a real partnership is not governed by how Michigan law might treat the same circumstances for purposes of state law. * * * Michigan cannot, by its decisions and laws governing questions over which it has final say, also decide issues of federal tax law. * * * The statutes of Congress designed to tax income actually earned because of the capital and efforts of each individual member of a joint enterprise are not to be frustrated by state laws which for state purposes

prescribe the relations of the members to each other and to outsiders."

See also Weiss v. Wiener, 279 U.S. 333, 337, 49 S.Ct. 337, 73 L.Ed. 720; Burk-Waggoner Oil Association v. Hopkins, 269 U.S. 110, 114, 46 S.Ct. 48, 70 L.Ed. 183; Commissioner of Internal Revenue v. Fortney Oil Co., 6 Cir., 125 F.2d 995, 997.

■ Upon careful examination of the entire record and applicable authorities the court is of the opinion and holds that the association's organization and manner of operation were more nearly those of a corporation than a partnership, during the years 1955 through 1960. The court accordingly holds that the association was a corporation within the meaning of §§ 7701(a) (2) and (3) and 761(a) of the Internal Revenue Code, and that the income here involved was that of the association for tax purposes and was not derived from any trade or business engaged in by the plaintiffs.

■ It appears from the record that between 1955 and 1960 certain of the plaintiffs had filed returns claiming their distributive share of the income of the association as from self-employment and paid self-employment taxes. However, it appears that the amounts of these taxes were refunded to the plaintiffs and that the Social Security Administration notified the Internal Revenue Service that the postings for those years had been deleted from the plaintiffs' records. It also appears that in 1959 the association requested a determination from the Internal Revenue Service as to whether the distributive shares of its members could be treated as net income from self-employment. On May 26, 1959, the association was notified as follows:

"Section 1402(a) of the Self-Employment Contributions Act of 1954 provides, among other things, that the term 'net earnings from self-employment' means the gross income derived by an individual from any trade or business carried on by such individual. * * *

"Based upon our analysis of the available information and evidence, it is held that the business enterprises of the Association are, for purposes of the Self-Employment Contributions Act of 1954, the 'trades or businesses' of the Association and, therefore, none of such business enterprises constitutes a 'trade or business' of the individual members. The facts that the members contribute their services to the enterprises conducted by the Association and that they receive certain benefits from the Association do not result in the members being considered as carrying on the trades or businesses of the Association. Moreover, the Israelite House of David is not a partnership within the meaning of that term as defined in section 7701(a) (2) of the 1954 Code. Thus, it follows that the pro rata shares of its net income (whether or not distributed to the members) which pursuant to section 501(d) of the 1954 Code must be treated as *dividends received* by the members should not be counted in computing their net earnings from self-employment."

The court agrees with the conclusion of the hearing examiner, which was approved and adopted by the Appeals Council, "that the claimants' pro rata shares of the Association's income for the years involved constituted dividends which, under Section 211(a) (2) (of the Social Security Act), were not includable in computing net earnings from self-employment, and thus did not result in quarters of coverage."

■ The record of the proceedings before the hearing examiner on the supplemental hearing shows that in April, 1962, plaintiffs filed waiver certificates under § 1402(e) of the Internal Revenue Code, in which they purported to elect social security coverage as "ministers." Social Security Act, § 211(c), 42 U.S.C. § 411 (c). In his recommended decision the hearing examiner held that "the claimants did not acquire net earnings from self-employment in the relevant years by reason of waiver certificates electing

Social Security coverage pursuant to Section 211(c) of the Act." That section provides in part:

"(a) The term 'net earnings from self-employment' means the gross income, as computed under chapter 1 of Title 26, derived by an individual from any trade or business carried on by such individual, less the deductions allowed under such chapter which are attributable to such trade or business. * * *

"(c) The term 'trade or business', when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 23 of Title 26, except that such term shall not include— * * *

"(4) The performance of service by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order. * * *

"The provisions of paragraph (4) shall not apply to service * * * performed by an individual during the period for which a certificate filed by such individual under section 1402(e) of Title 26, Internal Revenue Code of 1954, is in effect."

Section 1402(e) of the Internal Revenue Code of 1954 provides:

"Any individual who is (a) a duly ordained, commissioned, or licensed minister of a church or a member of a religious order * * * may file a certificate (in such form and manner, and with such official, as may be prescribed by regulations made under this chapter) certifying that he elects to have the insurance system established by title II of the Social Security Act extended to service described in subsection (c) (4) * * * performed by him."

In his recommended decision the hearing examiner stated as follows:

"The Examiner finds that the record fails to establish that the claimants acquired net earnings from self-employ-

ment during any of the relevant years by filing waiver certificates. It is admitted that no certificates were filed for 1955. There is conflicting evidence as to whether certificates were filed for all of the claimants for subsequent years. It is not entirely clear whether the certificates were timely filed under Section 1402(e) (2) of the Code. Even if timely, they were not accepted by the Internal Revenue Service, but were returned to those who had sent them. * * *

"In addition, the election to obtain Social Security coverage by filing waiver certificates extends only to service by a 'minister' and by a member of a 'religious order' in the exercise of 'duties required by such order.' No claim is made that any of the claimants are ministers and the record would not support such a claim. * * * Furthermore, the Examiner finds that the term 'religious order' in Section 211(c) (4) of the Act does not include a religious organization which, like the Association, is exempt from income tax under Section 501(d) of the Code. As already pointed out, the members of such an exempt organization are required to treat their pro rata shares of the organization's income as taxable dividends, which are not includable in computing net earnings from self-employment. * * *

"Finally, even if the Association were a religious order under Section 211(c) (4), the election permitted by that section would not extend to service by the claimants because the record fails to show that such services were performed in the exercise of 'duties required' by the Association."

The court is convinced that the holding of the hearing examiner, which was approved and adopted by the Appeals Council, is correct and that plaintiffs did not derive net earnings from self-employment as the result of filing waiver certificates under § 211(c) of the Social Security Act. The court, therefore, concludes that the Appeals

Council in its original decision of June 15, 1960, was correct in its holding that plaintiffs are not entitled to old-age insurance benefits under the Social Security Act and that certain amounts paid to them were paid erroneously.

■ In their complaint plaintiffs further ask that "in the event the court finds that the deletions made by the Secretary, defendant herein, pursuant to the decision of his Appeals Council on the wage records of the plaintiffs are legal, the court order that any sums heretofore paid to the plaintiffs be forgiven in accordance with pertinent provisions of the Social Security Act." In its 1960 decision the Appeals Council found that the plaintiffs had been overpaid in amounts previously determined by the bureau and the hearing examiner, and that they should reimburse the United States for such overpayments. Section 204(b) of the Act, 42 U.S.C. § 404(b), provides:

"There shall be no adjustment or recovery by the United States in any case where incorrect payment has been made to an individual who is without fault * * * and where adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience."

Therefore, before there may be a waiver of an overpayment, it must appear that the claimant was "without fault" in causing the overpayment and that adjustment or recovery would be against equity and good conscience or would defeat the purpose of Title II of the Act. The Appeals Council found that under the facts disclosed by the record the plaintiffs were without fault in causing the overpayments. However, the Council further found as follows:

"The claimants, as members of the Colony, own no property, since all property is given to the Colony by each member. All current income from whatever source is likewise given to the Colony. Thus, the members have no 'income' in the generally accepted meaning of the term. On the other hand, the members have no personal expenses. Each of the claimants is assured of the necessities of life by the Colony, and hence is assured of at least a subsistence income. Under the circumstances, the Appeals Council is of the opinion, and so finds, that recovery or adjustment of the overpayments would not be against equity and good conscience and would not defeat the purpose of Title II. * * *

"It is the further decision of the Appeals Council that the adjustment or recovery of overpayments made to the claimants hereinabove found to have been overpaid cannot be waived by the United States."

The court is convinced that the Appeals Council correctly determined that the plaintiffs were without fault in causing the overpayments, and was also correct in its holding that recovery of such overpayments by the United States was not against equity and good conscience and could not be waived.

In summary the court concludes as follows:

(1) That the findings and conclusions of the hearing examiners, which were affirmed and adopted by the Appeals Council, were amply supported by substantial evidence.

(2) That the hearing examiner and the Appeals Council correctly held that the initial determinations in 1955 and 1956 that plaintiffs were eligible for old-age insurance benefits could be reopened by the Secretary for a redetermination as to their eligibility.

(3) That the Secretary properly revised the earnings records of the plaintiffs for the years 1955 to 1960 by deleting wages previously credited to them.

(4) That the association, the Israelite House of David, was for tax purposes a corporation within the meaning of 26 U.S.C. §§ 761(a) and 7701(a) (2) and (3); and that the income here involved was that of the association for tax purposes and was not derived from any trade or business engaged in by the plaintiffs.

(5) That the plaintiffs' pro rata shares of the association's income for the

years involved did not constitute earnings from self-employment and thus did not result in quarters of coverage to them under the Social Security Act.

(6) That the hearing examiner and the Appeals Council correctly determined that the plaintiffs did not derive earnings from self-employment as the result of filing waiver certificates under § 211 (c) of the Social Security Act.

(7) That the hearing examiner and the Appeals Council correctly determined that the recovery of the overpayments made to the plaintiffs could not be waived by the United States.

(8) That plaintiffs are not entitled to the relief sought in their complaint and amended complaint, and that their motion for a summary judgment should be denied.

(9) That defendant's motion for a summary judgment should be granted.

The court accordingly affirms the decisions of the Appeals Council, and an order will be entered denying the plaintiffs' motion for summary judgment and granting the defendant's motion for summary judgment.

A judgment will be entered in favor of the United States of America and against the plaintiffs for the amounts shown to have been overpaid to them as set forth in the attached Appendix A, which amounts were determined by the Bureau of Old-Age and Survivors Insurance.

## APPENDIX A

| Claimant | Period for Which Benefits were Erroneously Paid | Amount of Over-payments to be Refunded |
|---|---|---|
| Emily Blume | Dec. 1954 through Jan. 1958 | $ 1,140. |
| Joseph Hegner | Dec. 1954 through Dec. 1957 | 1,110. |
| Edmund Bulley | Dec. 1954 through Dec. 1957 | 1,169.20 |
| Dominick Zitella | Dec. 1954 through Jan. 1958 | 1,140. |
| Ethel Rosetta | May 1955 through Mar. 1958 | 1,020. |
| Edgar White | Dec. 1954 through Dec. 1957 | 1,110. |
| Flora White | Dec. 1954 through Dec. 1957 | 1,110. |
| Artemus K. Smith | June 1956 through Dec. 1957 | 570. |
| Eva Smith | Dec. 1954 through Dec. 1957 | 1,110. |
| Victor F. Larson | Oct. 1954 through Dec. 1957 | 1,170. |
| Estelle R. Larson | Oct. 1954 through Dec. 1957 | 1,170. |
| Hans L. Dalàger | Aug. 1954 through Dec. 1957 | 1,225. |
| William Hannaford | Dec. 1954 through Dec. 1957 | 1,110. |
| Lillian I. Ellis | Nov. 1956 through Feb. 1958 | 416. |
| Nick Caralis | Dec. 1954 through Feb. 1958 | 1,170. |
| George Phillips | June 1955 through Feb. 1958 | 990. |
| Jane Glover | Dec. 1954 through Dec. 1957 | 1,110. |
| Grace Lane | Nov. 1956 through Feb. 1958 | 472. |
| Anne (Annie) Lanier | Nov. 1956 through Feb. 1958 | 480. |
| Florence McCaslin | Mar. 1955 through Feb. 1958 | 1,080. |
| Violet Tucker | Nov. 1956 through Feb. 1958 | 435.20 |
| Edith Bell | Mar. 1955 through Feb. 1958 | 1,080. |
| Harry Kirkham | Dec. 1954 through Dec. 1957 | 1,110. |
| | Total | $22,497.40 |