TWIN OAKS COMMUNITY, INCORPORATED, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26160-82.        Filed December 3, 1986.

*Collins Denny III* and *Wallace M. Starke*, for the
petitioner.

*Scott Anderson*, for the respondent.

PARKER, *Judge*: Respondent determined deficiencies in
petitioner's Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1977 | $19,542.74 |
| 1978 | 7,274.55 |
| 1979 | 8,946.01 |
| 1980 | 7,489.00 |

The issue for decision is whether petitioner, which is
otherwise qualified as a tax-exempt organization under
section 501(d),[1] satisfies the requirement for a "common
treasury" or "community treasury." Resolution of this issue
depends on whether the terms "common treasury" or
"community treasury," as used in section 501(d), refer only
to a religious or apostolic organization that requires its
members to take a vow of poverty and totally renounce and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954
as amended and in effect during the taxable years in question.

completely divest themselves of individual or private owner-ship of all property, both real and personal, upon becoming members.

### FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Twin Oaks Community, Inc. (sometimes referred to as Twin Oaks), is a religious or apostolic organization. It is a non-stock corporation organized under the laws of the Commonwealth of Virginia.[2] Petitioner's principal office was located in Louisa, Virginia, at the time the petition was filed in this case. Petitioner maintained its books and records and filed its Federal income tax returns using the cash method of accounting and on the calendar year basis. For the taxable years at issue, petitioner filed its Federal tax returns on Forms 1065 (U.S. Partnership Return of Income) with the Internal Revenue Service Center in Memphis, Tennessee.

Twin Oaks is the oldest member of the Federation of Egalitarian Communities (the Federation) and has served as the role model for the creation of many members of the Federation. The original inspiration for the creation of Twin Oaks came from the book entitled "Walden Two," written by the behavioral psychologist, B.F. Skinner. In Walden Two, Skinner describes a utopian community based on reinforcement theories and humanistic approaches to a cooperative lifestyle in which property is held in common and shared and in which the sense of position and wealth is minimized.

In 1967, the organizers of Twin Oaks acquired 123 acres of land along the South Anna River in Louisa County, Virginia, on which a community was established. On February 13, 1973, Twin Oaks was organized as a Virginia non-stock corporation and acquired this property in the same year. At the time of trial, Twin Oaks owned approximately 470 acres of land, of which about 100 acres were farmed.

---

[2]See generally Va. Code Ann. secs. 13.1-201 et seq. (Repl. Vol. 1978).

The sole purpose and activity of Twin Oaks has been to organize and operate a religious or apostolic community based on a communal plan in which the members maintain a communal lifestyle following the tenets and teachings of Twin Oaks. The tenets of Twin Oaks are embodied and set forth in Twin Oaks' Statement of Religious Theory and Practice. The tenets and teachings of Twin Oaks involve the promotion of general equality among humanity centering on the basis of spiritual and moral interrelatedness among all people by promoting nonviolence, harmonious cooperation, spiritual awareness, equality, and other similar values through Twin Oaks' physical and social structures and the daily interactions among its members.[3]

Twin Oaks does not sponsor the formal services and liturgies of conventional religions, but rather focuses on creating an environment for the daily practice of its beliefs. Regular meetings are conducted for discussions and lectures on subjects that concern or affect its beliefs. Twin Oaks observes four annual holidays, one on each equinox and one on each solstice, at which times trees are decorated in observance of the change of seasons.

The environment created in the Twin Oaks community in which the members live and work is that of an alternative society, where members may practice their different values and from which the members can carry out and advocate further development of the beliefs and practices of Twin Oaks as a community. The communal living and work structures of Twin Oaks, the egalitarian standard of living practiced by its members, and the regular forums for collective discussion and implementation of the community's beliefs create an effective environment for the realization of Twin Oaks' ideals.

During the taxable years in issue, the membership of Twin Oaks consisted of approximately 65 to 70 adults and as many as 10 children. The members of Twin Oaks are housed on Twin Oaks' property in five large residential buildings and a children's building.

---

[3]Petitioner has set out its tenets and beliefs at some length in its requested findings of fact, and respondent has interposed no objection to these requested findings. However, since respondent concedes that petitioner is a religious or apostolic organization, we think it unnecessary to delve any further into the specifics of petitioner's tenets and beliefs.

The members of Twin Oaks engage in farming and gardening, for both commercial purposes and for their own domestic needs. The members also manufacture and sell rope crafts such as hammocks, hammock chairs, and backpacker hammocks. They are also involved in commercial construction contracting, printing, lecturing, and conference leadership.

Each member of Twin Oaks is expected to undertake a fair share of the work of the community, which usually amounts to a minimum of 45 hours per week. Each member's work load is budgeted in a manner similar to a financial budget. Roughly one-third of this work involves income-producing activities, primarily related to the manufacture of rope hammocks and related products. The remainder of each member's work load is devoted to domestic activities, including child care, food production, food preparation, and sewage disposal. Members are also involved in the construction, improvement, maintenance, and repair of Twin Oaks' buildings, machinery, and vehicles used in the conduct of Twin Oaks' activities.

In addition, Twin Oaks provides the services of its members to assist in public social welfare and educational activities, for the benefit of the surrounding communities in Louisa County. Some of these services include assistance in State- and county-supported emergency fuel programs for welfare families and in providing certified teachers to assist in schools attended by children of Twin Oaks' members and nonmembers.

All of the earnings from the various business activities of Twin Oaks are paid into a community treasury maintained by Twin Oaks, from which the needs of the members are met. From this community treasury, Twin Oaks provides for its members all food, clothing, housing, medical, and other personal needs appropriate to the philosophy of the community. Direct medical benefits are limited to preventative and emergency care, with benefits for pregnancy, parturition, and other treatment being discretionary. In addition, Twin Oaks entered into a medical insurance policy for the benefit of its members. Any additional medical expenses of members are covered by advances to the members from the community treasury. Repayment of these

advances is not required if the individual continues as a member for a certain period of time after the advance has been made.

In addition to community needs provided to its members directly from the Twin Oaks' community treasury, certain other financial allowances are permitted. Each member of Twin Oaks is allotted between $7 and $10 per month for personal spending money. Each member can earn $1 per hour for community income-producing work in excess of his budgeted weekly work requirement. Moreover, a member who terminates membership in Twin Oaks and leaves the community is paid a "leaving fund" of $50 from the community treasury to assist in transportation costs. Upon termination, a member is also entitled to begin receiving repayment of any loans previously made to Twin Oaks, but is not entitled to any other portion of the Twin Oaks' community treasury. However, in the event of the dissolution of Twin Oaks, each member at the time of dissolution will be granted a "leaving fund" of $1,000.

Twin Oaks also allows its members to take vacations outside the County of Louisa, Virginia. Members are permitted to earn small amounts of money to spend on these vacations, but no amount can be spent in the County of Louisa.

One aspect of Twin Oaks' philosophical practices is to eliminate the effects of major material values and trappings from the life of its members within the Twin Oaks community. Twin Oaks is designed to create an atmosphere in which there is complete equality among its members within a community that shares in a modest material existence.

In furtherance of these beliefs and practices, Twin Oaks requires its members to insulate themselves from all private possession of property. However, members are allowed to receive gifts of cash and other items valued at no more than $35 per year. In addition, members are allowed to retain certain "permitted personal effects," which may be kept in the member's designated private living space, provided that such items are not deemed by Twin Oaks to be unsuitable in its environment or damaging to its philosophy of equality.

All larger personal, tangible assets that are brought by members to the Twin Oaks community must be either loaned or donated to Twin Oaks. For instance, licensed motor vehicles brought to the community must be registered in Twin Oaks' name. Twin Oaks is entitled to make all decisions regarding insurance and maintenance of the vehicle on the basis of its usefulness to the community. However, if an individual's membership in Twin Oaks is terminated, any vehicle loaned by him to Twin Oaks is returned and reregistered in his name. Vehicles donated to Twin Oaks remain the property of Twin Oaks following the termination of the donor's membership.

To the extent that a member may own assets other than such "permitted personal effects," either (a) such assets must be placed in a non-income-producing status, (b) income earned on such assets (including dividends, interest, and realized capital gains on securities) must be paid over to the community treasury of Twin Oaks, or (c) such assets must be lent to Twin Oaks for its use without interest or other charges in respect thereto. In addition, members must agree that Twin Oaks shall become entitled to all appreciation in the value of any assets of the member sold during the period of his membership.

During the taxable years in issue, Twin Oaks operated under two sets of operational documents. Twin Oaks operated under one set of operational documents until October 19, 1979, and under another set thereafter. The operational documents included bylaws, community property code, working government description, and forms for membership agreements.

Both the original and revised operational documents provided for two classes of membership in Twin Oaks, provisional members and full members. Twin Oaks generally required a 6-month provisional membership period. With respect to private ownership of property, neither set of the Twin Oaks bylaws required its members to take a vow of poverty and to completely divest themselves of all individual property ownership upon becoming members. Members could retain title to real, personal, or intangible assets located outside the community. However, members were required to donate to the community all the income, if any,

generated from these assets. In addition, except for permitted personal effects, all property brought to the community was either donated or loaned to Twin Oaks for the benefit of the community. Any money or property loaned to Twin Oaks was required to be returned or repaid upon a member's termination.

Until the revision in October of 1979, the Twin Oaks bylaws contained a provision that provided that each member shall, as part of his membership agreement, establish a schedule for the eventual donation to the organization of all his property, except petty property. The schedule had to conform to the explicit community policy as of the time of joining. The membership agreements, in effect until October 19, 1979, essentially provided two different schedules that members could follow. Schedule A provides in pertinent part that the member will donate all property (except petty property) in various installments within 7 years, and Schedule B is identical in all material respects but provides a 12-year timetable. After October 19, 1979, and through December 31, 1980, Twin Oaks' bylaws eliminated any requirement that its full members donate all of their property.[4]

At no time during the years at issue did any member of Twin Oaks have any rights to property owned by Twin Oaks or to income (whether earned or contributed) of Twin Oaks, other than the rights to support and maintenance by Twin Oaks as described above.

Petitioner presented testimony by an expert on utopian and religious communities, who contrasted the Benedictine Monks who require an absolute vow of poverty as part of their religious way of life and the Shakers who have a less restrictive property code. Before their recent decline, the Shakers were a religious, communal organization with three classes of member: novitiate, a middle level, and full members. At the novitiate level, members were allowed to retain possession of their property. At the middle level, a member's property ownership and control was minimized, but he was only required to place it with the Shaker organization, and he could reclaim it upon terminating

---

[4]Twin Oaks' bylaws were again changed effective Jan. 1, 1981, and respondent has recognized Twin Oaks' exemption under sec. 501(d) effective Jan. 1, 1981.

membership. Upon achieving full membership, a member was required to give all his property to the Shaker organization. The Shaker constitution provided that if a full member left the organization he could reclaim some of the property he donated, and the practice was for the Shaker organization to turn over to the departing full member enough assets to allow him return to more conventional society in substantially the same position as he had left it. The Shakers' system of property regulation was derived from their religious belief in trying to follow a system of life dictated by scriptural passages.

The regulation of private ownership of property is common in communal organizations and is essential to setting the standard by which the lives of members within the organization are organized. The degree to which a communal organization regulates property ownership by its members depends upon the objectives which the organization seeks to achieve. The religious objective of Twin Oaks is to create a community based upon the philosophy of humanism in which people help one another, share the product of their efforts, and minimize all sense of position and wealth. Twin Oaks' system of property regulation, as contained in its bylaws which were in effect from October 19, 1979, through December 31, 1980, had the effect of only requiring its members to insulate themselves from the economic effects of private property ownership without requiring an absolute vow of poverty under which all private ownership of property is renounced. Such a system of property regulation is sufficient to achieve the religious objectives of Twin Oaks.

During the taxable years in issue, petitioner considered itself taxexempt pursuant to section 501(d), and accordingly filed its Federal income tax returns for each of these years on Form 1065 (U.S. Partnership Return of Income). Each such return included a Schedule K-1 (or a substitute therefor in 1980) for each member of Twin Oaks. All Schedules K-1, or substitutes therefor, for each respective year in issue were identical, with the exception that each Schedule K-1, or substitute, for a particular year had a different "partner's identifying number" and partner's name, address, and Zip Code. In addition, the Schedules

K-1, or substitutes, for a member who joined or left during a year in issue reflected only income, credits, and deductions attributable to the member's period of membership in Twin Oaks. Each member of Twin Oaks, during the years in issue, included in his or her gross income his or her entire pro rata share of Twin Oaks' taxable income for that year in accordance with the Schedules K-1, or substitutes therefor, attached to petitioner's Form 1065 for such year.

By statutory notice of deficiency dated August 13, 1982, respondent determined that Twin Oaks was not an organization described in section 501(d) during the taxable years 1977 through 1980, and that its income for those years was not properly reported on Form 1065 (U.S. Partnership Return of Income). Accordingly, respondent recomputed petitioner's Federal income tax liability on Form 1120 (corporate return) for each year in issue based on the information contained in Twin Oaks' Forms 1065.[5]

OPINION

Section 501(a) exempts from taxation an organization described in section 501(d).[6] Section 501(d) describes such an organization as follows:

---

[5]The parties have now stipulated that if Twin Oaks is not exempt from tax under sec. 501(d) for the years in issue, then Twin Oaks' Federal income tax liability for the years in issue is as follows:

| Year | Tax liability |
| --- | --- |
| 1977 | $9,971.68 |
| 1978 | 4,850.58 |
| 1979 | 7,225.57 |
| 1980 | 7,535.01 |

The parties further stipulated that if Twin Oaks is exempt from tax under sec. 501(d) for the 1977 and 1978 taxable years and for the portion of the 1979 taxable year until Oct. 19, 1979, but is not so exempt for the balance of the 1979 taxable year or for the 1980 taxable year, then Twin Oaks' income tax liability is as follows:

| Year | Tax liability |
| --- | --- |
| Short period | |
| Oct. 19, 1979-Dec. 31, 1979 | 0 |
| 1980 | $2,958.57 |

The record does not explain why the tax liability for 1980 differs in the two situations of nonexemption.

[6]Sec. 501(a) provides as follows:

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

SEC. 501(d). RELIGIOUS AND APOSTOLIC ORGANIZATIONS.—The following organizations are referred to in subsection (a): Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire pro rata shares, whether distributed or not, of the taxable income of the association or corporation for such year. Any amount so included in the gross income of a member shall be treated as a dividend received.

There is no dispute that petitioner meets three of the four requirements for exemption under section 501(d). Petitioner is a religious or apostolic corporation. Petitioner engages in a manufacturing and sales business for the common benefit of its members. Petitioner's members include in their gross income as dividends received their entire pro rata share of petitioner's taxable income, whether or not such income is actually distributed to them. The only issue in this case is whether petitioner maintains a common treasury or community treasury.

Respondent contends that the terms "common treasury" or "community treasury," as used in section 501(d), impose a requirement that members of such a religious or apostolic organization must take a vow of poverty and irrevocably contribute all of their property, both personal and real, to the organization upon becoming members and not be entitled to any part of that property upon leaving the organization. Respondent argues that the property codes in effect for Twin Oaks during the years in issue do not require its members to donate their property to the organization, and, therefore, Twin Oaks was not an organization described in section 501(d) during these years. Petitioner contends that property that members may or may not own outside of the religious or apostolic organization is irrelevant to the determination whether the organization is described in section 501(d). Petitioner argues that the terms "common treasury" or "community treasury," as used in section 501(d), describe an arrangement where all profits generated by the community business are placed into a community treasury and no member has any right to receive or enjoy any of the assets in the community treasury, except for support and maintenance. We must

decide, as an issue of first impression, the meaning of the terms "common treasury" and "community treasury" as used in section 501(d).

Unfortunately, these terms are not defined in the Code or in the regulations. The regulations simply track the language of the statute and provide little assistance.[7] Moreover, the parties have not cited, and we have not found, any case construing the meaning of "common treasury" or "community treasury," as used in section 501(d). Consequently, we must look to the language of the statute and its legislative history in construing these terms so as to give effect to the intent of Congress. *United States v. American Trucking Associations*, 310 U.S. 534, 542-545, rehearing denied 311 U.S. 724 (1940).

Section 501(d) was originally enacted into law as section 101(18) as part of the Revenue Act of 1936. Section 101(18) has effectively survived subsequent legislation and essentially was reenacted verbatim in the 1939 Code and as section 501(d) of the 1954 Code.[8] The legislative history accompanying the original enactment of this provision is rather scanty and the congressional intent somewhat obscure. The legislative history consists primarily of comments made by Senator Couzens during a hearing before the Senate Finance Committee on the Revenue Act of 1936 where he expressed a need for a specific provision to change the then existing method of taxing certain religious and apostolic organizations, and remarks made by Senator Walsh on the floor of the Senate at the time he introduced the amendment that was eventually adopted as section 101(18) of the Revenue Act of 1936. Respondent argues that the remarks of Senator Couzens to the Senate Finance

---

[7]Sec. 1.501(d)-1(a), Income Tax Regs., provides as follows:

Religious or apostolic associations or corporations are described in section 501(d) and are exempt from taxation under section 501(a) if they have a common treasury or community treasury, even though they engage in business for the common benefit of the members, provided each of the members includes (at the time of filing of his return) in his gross income his entire pro rata share, whether distributed or not, of the net income of the association or corporation for the taxable year of the association or corporation ending with or during his taxable year. Any amount so included in the gross income of a member shall be treated as a dividend received.

[8]Sec. 101(18) of the Revenue Act of 1936 was reenacted verbatim in the 1939 Code, sec. 101(18), 53 Stat. 35, 76th Cong., 1st Sess. (1939), and was reenacted as sec. 501(d) in the 1954 Code. Sec. 501(d), 68A Stat. 165, 83d Cong., 2d Sess. (1954). Except for using the term "taxable income" rather than "net income," sec. 501(d) is essentially identical to sec. 101(18) as originally enacted in the Revenue Act of 1936.

Committee and Senator Walsh's statement on the Senate floor suggest that section 101(18), now section 501(d), was intended only for those religious or apostolic organizations that require their members to take vows of poverty and divest themselves of all property upon joining the organization. Comments by individual members provide an uncertain guide as to the intent of the legislative body.[9] More importantly, these comments were general descriptions of some types of religious or apostolic organizations, not definitions of the terms "common treasury" or "community treasury." Respondent tries to use these general descriptions of certain types of religious or apostolic organizations to circumscribe the meaning of common treasury or community treasury. However, we note that the term "religious or apostolic associations or corporations" is itself not defined in the statute, although Senator La Follette pointed out to Senator Couzens the inherent definitional problems.

The need for a provision, changing the then-existing law of taxing certain religious and apostolic organizations as corporations, was originally brought to the attention of the Committee on Finance by Senator Couzens during a hearing on the Revenue Act of 1936. In that hearing, the following exchange occurred:

SENATOR COUZENS. I hesitate to do this, but there has been a long controversy about taxing these apostolic organizations who have a community interest, such as the House of David, the Shakers, and so on, the Holy Rollers, and all of those. They are not permitted to deduct the married man's or single man's allowance, and they are taxed as a corporation. *When they enter these organizations, they put in all of their property, I understand, and do a community business*, run community

---

[9]In *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474-475 (1921), the Supreme Court stated:

"By repeated decisions by this court it has come to be well established that the debates in Congress expressive of the views and motives of individual members are not a safe guide, and hence may not be resorted to, in ascertaining the meaning and purpose of the law-making body. *Aldridge v. Williams*, 3 How. 9, 24; *United States v. Union Pacific R. R. Co.*, 91 U. S. 72, 79; *United States v. Trans-Missouri Freight Association*, 166 U. S. 290, 318. But reports of committees of House or Senate stand upon a more solid footing, and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. *Binns v. United States*, 194 U. S. 486, 495. And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee members in charge of a bill in course of passage. *Binns v. United States, supra; Pennsylvania R. R. Co. v. International Coal Co.*, 230 U. S. 184, 198-199; *United States v. Coca Cola Co.*, 241 U. S. 265, 281; *United States v. St. Paul Minneapolis & Manitoba Ry. Co.*, 247 U. S. 310, 318."

farms, and all of the revenue is put in one pot and they are taxed as a corporation, and the married people in these organizations are not permitted to deduct anything for being married, or the single men for being single. So they have been imposed on for a number of years by that application of the law to them.

I would like, if there is not too much objection, to have an amendment drawn and later submitted to the committee covering that question. There are a number of organizations throughout the Nation who are very adversely affected, and it does seem to me an antireligious procedure to follow in the tax law.

SENATOR WALSH. Of course, there is no objection.

SENATOR KING. Mr. Beaman, I talked this over with you and some of the other experts the other evening down in your rendezvous. Did you prepare something?

MR. PARKER. This is a rather difficult proposition.

SENATOR LA FOLLETTE. It seems to me this is something that could be handled by the Bureau.

SENATOR COUZENS. I do not want to take up the committee's time, but I have here a memorandum of a memorandum of law, opinion 550, which was issued in 1916, and a memorandum signed by Mr. Ballantine, June 1918, in which they took no cognizance of it.

SENATOR LA FOLLETTE. The trouble is they held that these people are not religious organizations because they do not belong to an accepted religion, but to them it is just as much a religion as any other kind of a religion.

SENATOR COUZENS. It does not seem to me that there is any justification for it at all.

SENATOR LA FOLLETTE. If you would hold that they are a religion, they would get out under section 101.

MR. KENT. I do not think so—

SENATOR WALSH (interposing). Can we agree that the amendment can be ordered and submitted to the committee later?

MR. KENT. I do not believe that section 101 is broad enough to cover them, because that provides that no part of the earnings shall inure to any individuals. These people are getting individually the benefits of community earnings even though the funds as such are not divided between them.

SENATOR COUZENS. Yes; but they are not getting the benefit of the earnings to the extent that the married man gets an exemption of $2,500. They probably make $500 or $600, and an ordinary person would be exempt and they are not exempt.

SENATOR LA FOLLETTE. If you just decide they were a religious organization, then you would be confronted with the decision on section 101, and you could have taken care of it that way, and it is a lot easier than trying to put something in the law, because it is going to look very funny when you get through with it, I do not care how long you and Mr. Beaman and Mr. O'Brien work on it.

SENATOR KING. Prepare an amendment covering that.

SENATOR COUZENS. And you can submit it to me.

[Hearings on H.R. 12395 Before the Senate Comm. on Finance, 74th Cong., 2d Sess., Part 11, at 46 (1936). Emphasis added.]

We have no further information or background about the drafting of the actual language. Respondent contends that Senator Couzens' remarks to the Committee on Finance show that the type of organization he contemplated section 101(18), now section 501(d), to exempt was one that required its members to "put in all of their property" when they entered the community. However, the statute contains no definition of the type of religious or apostolic organization to be benefited, and requirements such as a vow of poverty or irrevocable contribution of all property, if intended, could have been easily spelled out.

When proposing the amendment that was finally adopted by the Revenue Act of 1936 as section 101(18), Senator Walsh made the following statement:

MR. WALSH. Mr. President, under existing law religious, educational, and charitable corporations are exempt from taxation under the income-tax title.

This amendment adds a new paragraph to section 101 of the revenue act, which exempts certain corporations from taxation under the income-tax title.

It has been brought to the attention of the committee that certain religious and apostolic associations and corporations, such as the House of David and the Shakers, have been taxed as corporations, and that *since their rules prevent their members from being holders of property in an individual capacity* the corporations would be subject to the undistributed-profits tax. These organizations have a small agricultural or other business. The effect of the proposed amendment is to exempt these corporations from the normal corporation tax and the undistributed-profits tax, if their members take up their shares of the corporations' income on their own individual returns. It is believed that this provision will give them relief, and their members will be subject to a fair tax.

[80 Cong. Rec. 9074 (June 5, 1936). Emphasis added.]

Respondent further argues that Senator Walsh, in explaining the purpose of section 101(18), the predecessor of section 501(d), indicated that an organization exempt from taxation under this section would have rules to "prevent their members from being holders of property in an individual capacity." However, we think that respondent has taken these comments out of context and has overemphasized the significance of these remarks. The proper

context seems to be the matter of the undistributed profits tax, which the amendment solved by making all net income taxable to the members, whether or not distributed. When read in proper context, we find it difficult to view Senator Walsh's comment as defining a religious or apostolic association or corporation, let alone as defining the terms "common treasury" or "community treasury."

From our reading of the meager legislative history, we find little support for respondent's argument. The interpretation of the terms "common treasury" and "community treasury," as suggested by respondent, furthers neither the purpose nor the effect of the statute. The purpose of section 101(18), now section 501(d), was to correct the inequity of taxing certain religious and apostolic organizations as corporations without their members having the benefit of deducting the married man's or single man's allowance. Hearings on H.R. 12395 Before the Senate Comm. on Finance, 74th Cong., 2d Sess., part 11, at 46 (1936). The effect of section 101(18), now section 501(d), eliminates the normal corporate tax and the potential undistributed profits tax on certain religious and apostolic organizations that are attributable to the income generated by these organizations, provided, however, the members of such organizations include in their gross income their entire pro rata shares of the organization's income, whether distributed or not. 80 Cong. Rec. 9074 (June 5, 1936).

Both the purpose and effect of section 101(18), now section 501(d), focus on the income generated by these religious or apostolic organizations that maintain a common or community treasury. Respondent has not presented and we have not found any connection between the purpose and effect of the statute and respondent's attempt to restrict its applicability to only those religious or apostolic organizations that require their members to take vows of poverty and divest themselves of all property ownership.

If anything, the comments made by Senator Couzens and Senator Walsh weaken rather than support respondent's position. We find it significant that both Senator Couzens and Senator Walsh specifically named the *Shakers* as one of the organizations for which section 101(18) was intended to apply. Respondent concedes on brief and the record estab-

lishes that the Shaker community did not require all of its members to take vows of poverty and completely divest themselves of all individual property ownership outside of the organization.[10] However, respondent speculates that Senator Couzens and Senator Walsh believed that Shaker communities had rules prohibiting the ownership of private property, and, therefore, whether or not these rules actually existed is irrelevant. We reject such speculation. In the absence of anything to the contrary, we must assume that Congress was cognizant of all the relevant facts surrounding the enactment of this Code section.

In any event, we think the statements in the scanty legislative history referring to property ownership in connection with certain religious and apostolic organizations are merely illustrative rather than definitive. These statements that respondent places so much emphasis upon are at best brief descriptions of the internal rules of certain religious or apostolic organizations and do not amount to a legislative requirement that members of such organizations must take vows of poverty in order for the organization to obtain the benefits of what is now section 501(d). We agree that the concept of a common or community treasury maintained by the organization for the maintenance and support of its members connotes that the property of such organizations not be held by members individually but rather held in a "community capacity" with all members having equal interests in the community property. We think that on the facts of this case, Twin Oaks maintains and operates such a common or community treasury as to the organization's communal property and communal income. However, we think the requirement for a common or community treasury does not mean that members are necessarily prohibited from owning property outside and apart from the organization. We simply do not read the terms "common treasury" and "community treasury" as

---

[10]The Shaker community provided three levels of membership. The first order, called the novitiate class, consisted of members who had received the gift of faith but had chosen to live with their natural families and direct their own temporal affairs. Members of the second class still owned property but ceased using all or part of it in order to join the production-consumption cooperative that constituted the economic infrastructure of the community. Members of the the third class categorically renounced all of their property, which became a part of the common, jointly held, inalienable property of the society. However, if full members left the Shaker community, they were given property to help them return to the outside world.

requiring members of section 501(d) organizations to take vows of poverty and as prohibiting them from owning property individually outside and apart from such organizations.

In addition, we think that the limited tax relief afforded by section 501(d) does not mandate the imposition of such restrictive requirements on these organizations. Unlike section 501(c)[11] that essentially provides a total tax exemption to organizations described therein, section 501(d) exempts the organization from tax but shifts the liability for such taxes to its members, who must report their pro rata shares of the organization's income. Section 501(d) simply prevents the potential double tier of taxation by eliminating the corporate tier of tax on the organization and allowing a single level of tax to be imposed on the individual members. This exemption, however, is contingent on the members reporting their pro rata shares of the organization's income. As described in *Kleinsasser v. United States*, 707 F.2d 1024, 1025-1026 (9th Cir. 1983):

> Section 501(d) was intended to provide tax relief for religious organizations that have a common or communal treasury. Without § 501(d), the income of a religious corporation * * * would be subject to the regular corporate income tax at the corporate level, and, if distributed to organization members, the individual income tax at the shareholder level. If the corporate income were not distributed, the corporation would pay both the corporate income tax and the accumulated earnings tax. Section 501(d) eliminates the corporate level of taxation and leaves a single tier of individual income taxation. The scanty legislative history suggests that this single tier of taxation was believed to be the fair way to tax members of § 501(d) organizations.

---

[11]Organizations listed under sec. 501(c) are subject to tax imposed by sec. 511 on any unrelated business taxable income as defined in sec. 512. Since a sec. 501(d) organization, by definition, engages in business for the benefit of its members, there can be no unrelated trade or business, no unrelated business taxable income, and no investment tax credit in connection with unrelated business taxable income for sec. 501(d) organizations. See *Kleinsasser v. United States*, 707 F.2d 1024 (9th Cir. 1983). We note that sec. 1879(j)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2908 changed the result in that case by providing that solely for purposes of the investment tax credit, the sec. 501(d) organization is to be treated as an unrelated trade or business and that the investment credit is to be passed through pro rata to the members. However, if a member is otherwise entitled to an investment credit, he would lose the benefit of his pro rata share of the investment credit, and no other person could receive the benefit of his pro rata share. This change in the law was made retroactive to periods after Dec. 31, 1978, and sec. 501(d) organizations have a year within which to file refund claims in regard to these investment tax credits.

In addition, in setting forth the requirements for exemption under section 501(d), the Ninth Circuit stated:

The only requirements for the exemption are that there be a common treasury, that the members of the organization include pro rata shares of organization income when reporting taxable income and, implicitly, that the organization have a religious or apostolic character. Once this requirement of form is fulfilled, the exempt organization is unlimited as to function. * * * If the organization had income that it failed to allocate to its members, it would simply lose its exemption altogether. [*Kleinsasser v. United States, supra,* 707 F.2d at 1029.]

Furthermore, the Ninth Circuit indicated that the exemption under section 501(d) was not limited to nonmaterialistic sects.[12] The court stated that "The members of a section 501(d) organization could live in luxury as long as all income is allocated pro rata and reported on the members' individual tax returns." *Kleinsasser v. United States,* 707 F.2d at 1029 n. 3.

Thus in view of the limited tax relief afforded by section 501(d), we find no reason for distinguishing between religious or apostolic organizations that require their members to divest themselves of all property ownership and those that do not. Indeed, this limited tax relief provides little room for potential abuse of section 501(d). If a section 501(d) organization permits its members to own property outside and apart from the organization, any income generated by such property is simply reported on the member's individual income tax return, in addition to his Schedule

---

[12]In an earlier and the first reported case where any court had generally construed the application of section 101(18), the predecessor of sec. 501(d), the Ninth Circuit stated:

"One might assume, then, that Congress intended an association somewhat akin to the ordinary association or partnership in which each member has a definite, though undivided, interest in the business conducted for the common benefit of the members, as well as a common interest in the community treasury and property. The business and benefit mentioned appears to be something more tangible and worldly than spiritual comfort though the common community enterprise is to be related to or associated with a religious group and doctrine, and being under the aegis of that group. The Church with which we are here concerned would not fall within the exemptive provisions of Section 101(18). [*Riker v. Commissioner,* 244 F.2d 220, 230 (9th Cir. 1957), affg. a Memorandum Opinion of this Court, cert. denied 355 U.S. 839 (1957).]"

Although the Ninth Circuit noted in *Riker* that its comments concerning sec. 101(18) were simply gratuitous, the court's emphasis was on the member's relationship with respect to the organization's business ventures and the community treasury rather than on the religious and spiritual aspects of the member's relationship with the organization. Here we need not concern ourselves with such emphasis since respondent concedes that petitioner is a religious or apostolic corporation.

K-1 pro rata share of the organizaticn's taxable income. Moreover, the member includes this other income regardless of whether or not he is required to contribute, donate, or loan such income to the organization. Also, if the member must contribute such income to the organization, as Twin Oaks' members were required to do, such contributions to section 501(d) organizations are not deductible by the member. Since these organizations operate on a communal basis with a common treasury that is used for the support and maintenance of its members, the organization's income clearly inures to the benefit of the members, and thus is not a qualified donee organization under section 170. See *Riker v. Commissioner*, 244 F.2d 220 (9th Cir. 1957), cert. denied 355 U.S. 839 (1957). The Commissioner has taken the same position that contributions to section 501(d) organizations are not deductible, and petitioner does not suggest otherwise. Rev. Rul. 57-574, 1957-2 C.B. 161.

Also pursuant to section 501(d), members must include their pro rata shares of the organization's income and report such income as a dividend or, in effect, as ordinary income. In addition, the standard dividend exclusion provided by section 116(a) does not apply to dividends received from section 501(d) organizations. Sec. 116(b).[13] Consequently, regardless of the character of income generated by section 501(d) organizations, all such income is reported by the members as ordinary income. Moreover, the pro rata shares of the organization's taxable income that members report as dividends received do not constitute earnings from self employment (*Blume v. Gardner*, 262 F. Supp. 405 (W.D. Mich. 1966)), and the support and maintenance furnished by 501(d) organizations to their members do not constitute wages for Federal employment tax purposes. *Israelite House of David v. United States*, 58 F. Supp. 862 (W.D. Mich. 1945). In summary, we see numerous limitations and restrictions on the benefits conferred by section 501(d) and little potential for abuse. In the absence of some indication in the language of the statute itself or some stronger indication in its sparse legislative history, we see no reason

---

[13]We note that sec. 116 relating to partial exclusion of dividends received by individuals has been repealed effective for taxable years beginning after Dec. 31, 1986. Sec. 612(a), Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2250.

to graft on additional requirements to section 501(d), as respondent asks us to do.

Thus, the interpretation of the terms "common treasury" and "community treasury" as urged by respondent necessitates imposing a requirement on section 501(d) organizations that is neither contained in the Code nor the regulations thereunder. Respondent urges us to impose this additional requirement based entirely on the remarks of Senator Walsh and Senator Couzens contained in the scanty legislative history. However, absent a clearer statement of legislative intent that we should interpret the terms "common treasury" and "community treasury" as respondent suggests, we find it difficult to do so. Furthermore, "it is not the function of a Court to rewrite or amend a statute in the guise of construing it." *David Metzger Trust v. Commissioner*, 76 T.C. 42, 59-60 (1981), affd. 693 F.2d 459 (5th Cir. 1982), cert. denied 463 U.S. 1207 (1983).

Respondent nevertheless contends that he has consistently interpreted the terms "common treasury" and "community treasury" as used in section 501(d) to mean that an organization otherwise described under that section must require its members to contribute all of their property to a common treasury upon joining the organization. Respondent cites three revenue rulings to support this contention.[14] We note, of course, that revenue rulings merely represent the position of one of the litigants in this case. *Reinhardt v. Commissioner*, 85 T.C. 511, 520 (1985); *Crow v. Commissioner*, 85 T.C. 376, 389 (1985). As such, revenue rulings are not binding on the courts. *Stubbs, Overbeck & Associates v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971). However, revenue rulings may be helpful in interpreting a statute and may be considered on their own intrinsic merit and persuasiveness or lack thereof. In any event, the revenue rulings cited by respondent are neither contemporaneous interpretations of the statutory language nor directly on point. These revenue rulings do not address the issue presented herein, and we find them unpersuasive as to our issue.

---

[14]Rev. Rul. 78-100, 1978-1 C.B. 162; Rev. Rul. 58-328, 1958-1 C.B. 327; Rev. Rul. 57-574, 1957-2 C.B. 161.

In Rev. Rul. 78-100, 1978-1 C.B. 162, respondent determined that organizations supported by members' outside wages earned independently from the organization do not qualify for exemption under section 501(d). Organizations contemplated by section 501(d) are those that are supported by internally operated businesses in which all the members have an individual interest. In Rev. Rul. 58-328, 1958-1 C.B. 327, respondent determined that no part of a member's pro rata share of the taxable income of a section 501(d) organization (whether distributed or not) is includable in the computation of his net earnings from self-employment for purposes of the Self-Employment Contributions Act of 1954. In Rev. Rul. 57-574, 1957-2 C.B. 161, respondent determined that contributions to a section 501(d) organization which, in addition to the conduct of its religious and communal activities, is engaged in the operation of a commercial enterprise the proceeds of which inure to the common benefit of its members, are not deductible under section 170 and amounts paid or permanently set aside by a trust or estate for such an organization are not allowable as a deduction under section 642(c). In addition, bequests, legacies, devises, or transfers, or gifts of property to such organizations are not deductible for estate or gift tax purposes under section 2055 or section 2522.

These rulings simply are not dispositive of the issue before this Court and deal with the present issue only in an indirect, oblique manner. The only reference in these rulings to the property rights of the individual members is merely recited in the factual statement upon which two of those rulings are premised. In Rev. Rul. 78-100, *supra*, members of the organization described therein take vows of poverty and contribute all of their property to a common treasury. In Rev. Rul. 57-574, *supra*, each member, upon joining the organization described therein, completely surrenders to the organization all property of which he is possessed. Rev. Rul. 58-328, *supra*, contains nothing to indicate that members of section 501(d) organizations described therein take vows of poverty and contribute all of their property to the organization. In fact, Rev. Rul. 58-328, *supra*, appears to indicate to the contrary. This ruling indicates that section 501(d) organizations are permitted to distribute their profits to the

members, which seems to be inconsistent if members of such organizations are required to take vows of poverty. In any event, these rulings are factually distinguishable, do not address our issue, and are unpersuasive in that regard. While we have no argument with the holdings of any of these revenue rulings, they cannot be read as a consistent interpretation, or indeed, as any interpretation at all, of the terms "common treasury" or "community treasury."

Subchapter F contains various provisions where Congress has afforded certain organizations tax-exempt status. Some of the provisions provide greater or lesser tax relief than others. However, we are not aware of any tax-exempt provision contained in the Code where Congress has imposed on any organization the requirements that respondent urges us to impose on section 501(d) organizations. Moreover, respondent has not articulated, and we have not found, any reason why Congress would restrict section 501(d) to only those organizations otherwise described under such section that require members to take vows of poverty and renounce ownership of private property. In the absence of statutory language or some clear legislative history to that effect, we cannot read the bare terms "common treasury" or "community treasury" as imposing such requirements.

The focus of section 501(d) is on the income generated by certain religious or apostolic organizations. In the absence of anything to the contrary, we conclude that an organization has a "common treasury" or "community treasury," as used in section 501(d), when all of the income generated internally by community-operated businesses and any income generated from property owned by the organization is placed into a common fund that is maintained by such organization and is used for the maintenance and support of its members, with all members having equal, undivided interests in this common fund, but no right to claim title to any part thereof. Twin Oaks satisfies those requirements. Whether or not Twin Oaks as a religious or apostolic organization requires its members to take vows of poverty and dispose of all their property holdings outside of the organization is irrelevant to the meaning of the terms "common treasury" or "community treasury" as used in

section 501(d). Accordingly, since we find that Twin Oaks had a common or community treasury and since the parties have stipulated that petitioner otherwise satisfies the requirements of section 501(d) for the years in issue, we hold for petitioner.[15]

*Decision will be entered for the petitioner.*

---

[15]Petitioner argues that an interpretation of section 501(d) as suggested by respondent would interfere with Twin Oaks' ability to carry out its religious beliefs, which would raise serious First Amendment issues. However, because of our disposition of the issue in this case, we find it unnecessary to address these constitutional issues.