PAUL W. SEELBACH AND ARLENE M. SEELBACH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Seelbach v. Commissioner
Docket No. 33780-87
United States Tax Court
T.C. Memo 1989-600; 1989 Tax Ct. Memo LEXIS 595; 58 T.C.M. (CCH) 613; T.C.M. (RIA) 89600; November 1, 1989
Paul T. Mengal, for the petitioners. Dennis G. Driscoll, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In separate notices of deficiency respondent determined a deficiency of $ 2,133 in the 1984 income tax of petitioner, Paul W. Seelbach, and a deficiency of $ 3,318 in the 1985 income tax of petitioners, Paul W. Seelbach and Arlene M. Seelbach. The only issue for decision is whether certain payments received by petitioner, Paul W. Seelbach, are excludable from income under section 117[1] as fellowship grants. *596 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by reference. Petitioners resided in Michigan at the time they filed their petition. Paul W. Seelbach was unmarried during 1984 and timely filed an income tax return for that year as a single person with the Internal Revenue Service Center, Cincinnati, Ohio. Paul W. and Arlene M. Seelbach were married during 1985 and timely filed a joint income tax return for that year with the same Service Center. Arlene M. Seelbach is a party to this action solely by virtue of having signed the joint return for 1985; consequently, all references hereinafter to petitioner in the singular are to Paul W. Seelbach. After receiving both a bachelor's degree and a master's degree in aquatic biology from Bucknell University, petitioner entered the University of Michigan's School of Natural Resources as a Ph.D. candidate in September of 1980. On December 15, 1980, petitioner agreed to participate in a doctoral fellowship program by executing a memorandum agreement with University of Michigan and the Michigan Department of Natural Resources (DNR). DNR, *597 through its Institute for Fisheries Research (Institute), had over the preceding 50 years developed the fellowship program in cooperation with both the University of Michigan and Michigan State University for doctoral candidates who were willing to pursue degrees in areas which were of interest to DNR. The memorandum agreement entered into by petitioner with DNR and the University of Michigan was on a form prepared by DNR and entitled MEMORANDUM OF UNDERSTANDING ON DOCTORAL FELLOWSHIP PROGRAMS BETWEEN MICHIGAN DEPARTMENT OF NATURAL RESOURCES, UNIVERSITY DEPARTMENTS, AND GRADUATE STUDENTS INVOLVED. In the memorandum petitioner, as the doctoral candidate, generally agreed to do research with regard to the "Population status, natural reproduction, and stream ecology of the rainbow trout * * * in Michigan waters." The research problem was chosen by DNR. In accordance with the memorandum agreement, petitioner decided to limit his study to the natural reproduction of steelhead trout in Lake Michigan waters and the contribution of natural steelhead to the total steelhead population relative to the contribution made by hatchery-raised steelhead. Petitioner then prepared and submitted *598 to DNR and the University of Michigan a proposed study program in which he stated that such a study was justified because the steelhead, a type of rainbow trout which was native to the Pacific Coast, had been introduced in 1875 into the Great Lakes and their tributaries and by 1980 was providing high quality and widespread sport fishing in Michigan. Petitioner then appeared before his doctoral committee to defend his research proposal. DNR was represented on his doctoral committee by Dr. W. C. Latta, the Director of the Institute as well as an adjunct professor in the University's School of Natural Resources. The other three members of petitioner's doctoral committee were not employees of DNR. Among them was Dr. James Diana, the committee chairman, who was an associate professor in the University's School of Natural Resources and who had been the chairman of the doctoral committee for a number of other students in fisheries biology. While Dr. Diana was not an employee of DNR some of his research was funded with grants given to the University by DNR. During petitioner's doctoral candidacy most of his supervision was provided by Dr. Diana but Dr. Latta, the DNR representative *599 on the committee, provided the second most supervision since he met with petitioner regularly to monitor his progress and to offer guidance. In the Memorandum of Understanding, which he entered into at the beginning of his candidacy, petitioner was informed that the products of his research and the right to its publication were his but DNR was entitled to periodic reports on his progress and to a copy of petitioner's thesis. He was also informed that once a research topic was agreed upon, neither petitioner, DNR, nor the University could make any major change in the topic without the permission of the other parties to the memorandum. By way of background the memorandum also stated that in the opinion of DNR the doctoral program had been highly successful in the past because (1) nine out of ten previous fellowship arrangements had resulted in the production of an excellent thesis based upon well done research within a reasonable period of time and at moderate expense, (2) DNR had received considerable assistance from the University at no cost in the form of supervision and guidance of the doctoral candidates by its faculty, and (3) DNR had an opportunity to obtain better personnel *600 by contributing to the education and training of the candidates and upon their completion of the program by offering at least some of them permanent positions with DNR. In the Memorandum of Understanding the DNR's arrangement with petitioner during his doctoral candidacy is referred to as a fellowship and is described as follows: Each fellowship (i.e., a particular student working on a given problem) is a separate entity. The establishment of the fellowship is dependent upon three considerations: (1) the state has a particular problem, or "problem area" which must be studied, which it can support financially, and which can be solved within the time and effort available in a one-man fellowship approach; (2) a graduate student is available who is interested in working on the problem, and who has gained admission to a graduate school at * * * Michigan university * * * and (3) the university * * * through its graduate faculty, must find the particular problem suitable for a doctoral program, both scholastically and practically, and a member of the graduate faculty must agree to be the student's major advisor. * * * The student's work is guided by a faculty advisor and a graduate *601 committee of the university. The student's immediate supervisor in the State Natural Resources Department should serve, if only in an unofficial capacity, on the student's doctoral committee, or else the supervisor should have frequent consultation with the doctoral committee concerning the student's work. In the memorandum petitioner's status, responsibilities, and pay during the program are described as follows: The student is a State Civil Service employee. He must get approval to engage in other employment. He is in the established Civil Service position of Student Assistant 07. He does not have to qualify for this position by Civil Service examination; rather, Civil Service accepts the university entrance requirements to graduate school as adequate. The fellowship pay is: 1. 65% of top of the Student Assistant 07 grade, until student completes all formal course work, language exams, and doctoral preliminary exam as required by the student's doctoral committee or graduate school. 2. 80% of top of Student Assistant 07 grade, after completing requirements list in (1) and until final thesis is accepted by graduate school and student has passed his doctoral final *602 exam. During both (1) and (2), or throughout the fellowship, the pay is either 65% or 80%, as outlined above. It does not go to 100% during the summer months when the student may be working full time on a field problem. The philosophy here is that the student accepts the fact that he is not being reimbursed financially for all of his effort; after all, he is going to school for his self-improvement. The Fellow works on a 12-month per year basis, with annual leave computed as for other state employees. * * * The student's supervisor in the Department of Natural Resources must advise the Personnel Division in writing when the student is entitled to go from 65% to 80% pay. In administrative detail the student is treated like a regular state employee. This applies to attendance records, service ratings, annual and sick leave, and is subject to standard travel regulations, etc. while the student is being paid at the 65% rate, he is to work 65% of an 80-hour bi-weekly pay period on some phase of his research work, and correspondingly work at least 80% on research when he is being paid 80% salary. Under certain circumstances the student may be asked to assist in research other *603 than his own. Assignment of such duties will be made by the supervisor of the unit to which the student is attached. It will be the responsibility of the supervisor to see that assignments of this nature are not unreasonable and do not seriously conflict with the student's major project. The student must stay enrolled in his university and pay tuition during the regular college year, even during the latter part of the fellowship when he is working only on his thesis. The point is that, especially during this period, he needs much help from the university in library facilities and consultation with the faculty, and it is only fair that tuition be paid. Tuition is paid by the student, not by the state. Nonresident married students sometimes can get the cheaper tuition that applies to Michigan resident students by dropping out of school for a semester to meet a residence requirement. Although we sympathize with the student's financial problems, the drop-out procedure cannot be accepted, since it would disrupt the fellowship program. We are not in the business of helping students to circumvent university fees, and the fellowship stipend is adequate to include tuition costs. *604 The student receives subsistence and travel expenses from the state for field work on his research, including use of a state car and special equipment. His official work station is his university town, or, under special circumstances, a field location to which his work requires him to be assigned for more than six consecutive months. Field expenses will be paid according to department regulations. A reasonable amount of manpower assistance may be provided for the student's project where required by nature of the work. In some types of problems, the student may analyze extensive records collected by other department employees. With respect to the ownership of the results of the research the memorandum provided: The results of the fellowship research are primarily the property of the student but with a number of reservations: 1. Work records, specimens, and special equipment are the property of the state or university * * * to be turned over by the student after the thesis is completed. 2. The state can request and get brief progress reports during the study * * *.
3. The state will not publish the student's data or conclusions, without approval by both student and *605 university faculty, or until the material can be quoted from an approved thesis. 4. The state will help the student get the finished thesis published. If the student shows no interest in preparing the thesis for formal publication, the state reserves the right to do so. 5. The doctoral thesis is the sole property of the student and any published version of parts or all of it cannot be co-authored by others without the student's permission. Under "Other Considerations" the memorandum contained the following: The student's immediate supervisor in the Department of Natural Resources, or in some cases, other qualified Department personnel, should have an important role in assisting the doctoral committee in guiding the student's work. The employment may be terminated by mutual agreement of the state and university. There is the qualification that the State Civil Service Commission retains final authority in employment matters. Under the memorandum of agreement, DNR was not obligated to employ petitioner upon the successful completion of his doctoral program and petitioner was not obligated to accept such employment if it was offered. Some candidates who successfully *606 completed the program were not offered permanent positions by DNR. At trial Dr. Latta, the director of DNR, could not recall any such candidate who had been offered a job by DNR and turned it down. The records of DNR indicate that petitioner first became an employee of the department on November 9, 1980, as a Student Assistant 07 at a pay rate of $ 8.42 per hour. During his participation in the program as a student assistant, petitioner received periodic raises due to increases in the pay scale of that position from $ 8.42 an hour in November of 1980 to $ 11.09 an hour in June of 1986. However, under the memorandum agreement petitioner was considered a part-time employee while a student assistant, and his actual rate of pay was reduced to the percentage limitations set forth in the agreement, 65 percent of the scale until completion of his coursework and 80 percent thereafter. For example, when the pay scale of a student assistant was $ 11.09, petitioner, as a part-time employee, received only $ 709.79 for each bi-weekly period which was 80% times 80 hours times $ 11.09 per hour. On June 15, 1986, petitioner became a full-time permanent employee of DNR as a fisheries biologist. *607 At that time the rate of pay for fisheries biologist was also $ 11.09 per hour, but as a full-time permanent employee petitioner was no longer subject to the percentage limitations set forth in the memorandum agreement. Furthermore, as a full-time permanent employee he was entitled to employee benefits such as sick leave, annual leave, dental and health insurance, and overtime compensation. As a student assistant he was not entitled to these benefits because under Michigan Civil Service, Student Assistants are not considered career appointments. In other words, student assistants are not full-time permanent employees of the state. DNR chose the rainbow trout as petitioner's broad topic of research. Petitioner, with the approval of his doctoral committee, elected to limit his research to the steelhead, a type of rainbow trout which is a high-quality sport fish and which is maintained in Michigan's waterways by an extensive state-supported hatchery system. The steelhead attracts many fishermen and their families to Michigan every year. With his research petitioner proposed to develop a method by which hatchery-raised steelhead could be distinguished from those reproducing naturally. *608 The ultimate object of the study was to determine, if possible, how successful the hatchery system was in maintaining the steelhead population by ascertaining the percentage of hatchery-raised steelheads that were able to return to their spawning ground. After his topic was approved by the doctoral committee and he had completed the necessary coursework, petitioner began his research in December of 1980 at a "weir," or fish-trapping fence, which was owned and maintained by DNR on the Little Manistee River at a distance of about 150 miles from the university. During the course of his research, which continued for five or six years, petitioner regularly sought and received input from the members of his doctoral staff, with Dr. Diana, the committee chairman, and Dr. Latta, the DNR representative, providing most of his guidance. Petitioner was entitled to reimbursement by DNR for travel expenses to and from the site of his field work including the use of a state car and any special equipment needed. If the nature of his work required it, he was also entitled to manpower assistance and to the use of records collected by other employees of DNR. In the event a conflict developed between *609 petitioner and a non-DNR student as to the use of DNR assets, petitioner would have prevailed. By all accounts, petitioner's topic was a difficult endeavor, but he was successful and received an award for his research. In December of 1986 petitioner received his Ph.D. and was still employed by DNR as a full-time biologist at the date of trial. In 1984 petitioner received $ 16,575.36 and in 1985 he received $ 17,399.00 from DNR. These receipts were not reported by petitioner as income on his returns for 1984 and 1985 because he concluded they were excludable fellowship grants under section 117. Respondent determined that the receipts were not fellowship grants. OPINION Both parties recognize that the underlying issue in this case is whether the amounts petitioner received from DNR were made with the primary purpose of furthering his education and training, or for the benefit of DNR. Section 117(a)(1)(B) excludes from gross income an amount received as a fellowship grant. Under section 117(b)(1), the exclusion does not apply to "any amount received which represents payment for teaching, *610 research, or other services in the nature of part-time employment required as a condition of receiving the scholarship or the fellowship grant." However, if "teaching, research, or other services are required of all candidates * * * as a condition to receiving such degree," such services will not be regarded as part-time employment. Sec. 117(b)(1). At first reading the statute's language would appear to extend an automatic exclusion to amounts received when performance of a service, such as research, is required of the recipient as well as all other candidates for the same degree. However, as respondent correctly points out, the exception for services required of all candidates comes into play only after it has been established that the payments in question constitute a scholarship or fellowship grant. Brubakken v. Commissioner, 67 T.C. 249 (1976); Steiman v. Commissioner, 56 T.C. 1350 (1971); Reese v. Commissioner, 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). If the payments do not possess the characteristics of a scholarship or fellowship, no exclusion is available, whether or not the services *611 rendered were required of all candidates for the degree. The words "scholarship" and "fellowship" are not defined in the code. However, the regulations define a scholarship as "an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies." Sec. 1.117-3(a), Income Tax Regs. Similarly, a fellowship is defined as "an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." Sec. 1.117-3(c), Income Tax Regs. The regulations also provide that scholarship and fellowship grants do not include "any amount * * * if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Nor do they include amounts paid to "an individual to enable him to pursue studies or research primarily for the benefit of the grantor." Secs. 1.117-4(c)(1) and (2), Income Tax Regs. The Supreme Court *612 has upheld the validity of these regulations, stating that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." Bingler v. Johnson, 394 U.S. 741, 751 (1969). Petitioner contends that the payments he received from DNR fall within Bingler v. Johnson as a "no strings" fellowship grant that exacted no quid pro quo from petitioner. Respondent contends that the payments constituted compensation for the research petitioner conducted. Alternatively respondent argues that the primary purpose of the payment was to benefit DNR, rather than to enable petitioner to pursue his studies. The two grounds upon which respondent contests the excludability of the grant are actually two different formulations of one basic test. In Bingler, the Supreme Court stated that "[the primary purpose test] is merely an adjunct to the initial 'compensation' provision [of reg. 1.117-4(c)]." 394 U.S. at 758 n. 32. *613 Consistent with this interpretation, the Circuit Court to which an appeal from this opinion would lie has stated that "consideration of the facts as indicia of compensation for services is a more meaningful test than that of whether the stipend was primarily for the benefit of the grantors." Stewart v. United States, 363 F.2d 355, 358 (6th Cir. 1966). Under either formulation of the test, petitioner's contention fails. In the Memorandum of Understanding it is clear that the payments were fashioned by DNR as compensation and petitioner was classified as a civil service employee of the state. Nevertheless, petitioner urges us to look at the substance of the relationship and not to its form. He contends that the civil service classification was only a means for DNR to avoid administrative difficulties and that DNR regarded petitioner as a fellow, and not an employee. However, the manner in which a provider treats such payments is usually considered evidence of their true character. United States v. Webb, 397 U.S. 179 (1970); Parr v. United States, 469 F.2d 1156, 1158 n. 5 (5th Cir. 1972). Our decision in Vaccaro v. Commissioner, 58 T.C. 721 (1972), *614 where we held that certain payments represented a true fellowship stipend even though they were structured as salary, is distinguishable on its facts from the case before us. Even though the payments made to the taxpayer in Vaccaro were recorded as compensation, the evidence clearly established that the taxpayer was not expected to, nor did he in fact, render any services which benefited the provider of the funds. Furthermore, the taxpayer in Vaccaro did not spend any appreciable amount of time with the research staff of the grantor, nor did he have close contact with any of its formal research projects. By contrast, in the case before us, the broad topic of petitioner's research was chosen by DNR, the provider of the funds. The fact that petitioner was permitted to further refine his research project to a certain aspect within the topic chosen, or to reject the chosen topic and propose another subject acceptable to DNR, does not cause his research to be of less benefit to DNR. Carroll v. Commissioner, 60 T.C. 96, 106-107 (1973). As pointed out by petitioner in his proposed research program, the steelhead is a high quality sport fish that attracts many *615 fishermen, as well as their families, to Michigan. While his research was obviously useful to other states which have and which value the steelhead, it was of more importance to Michigan because his studies were based on its waterways, climate and other local factors. Moreover, unlike the taxpayer in Vaccaro, petitioner carried out his research under the regular supervision of Dr. Latta, DNR's director, who was at least the second most influential member of the committee which would decide if petitioner's research was sufficient to merit the degree he sought. Petitioner also used the facilities of DNR and would have been allowed to use them to the exclusion of non-DNR students, if a conflict arose. While the results of his research and right to its publication belong to petitioner, we have previously held that such control does not establish that the grants were made for petitioner's benefit. Carroll v. Commissioner, supra at 107. In this case, there are other factors present which we have previously found to indicate that payments claimed to be grants are, *616 in reality, compensation for services rendered by the recipient. For instance, the amounts petitioner received were relatively large for grants, and while there is no dollar limitation to scholarship exclusions for degree-seeking candidates, relatively large payments are usually associated with compensation rather than grants. Zolnay v. Commissioner, 49 T.C. 389, 398 n. 7 (1968). Further, when petitioner received his doctorate and joined DNR as a full-time employee, his effective salary increased by only 20 percent. Such a modest increase supports an inference that the value of his services as a doctoral candidate were almost comparable to those of a full-time employee. Brubakken v. Commissioner, supra at 258. Another indication that the payments represented compensation rather than grants under section 117 is the fact that they were not dependent in any way upon the financial need of petitioner. Bingler v. Johnson, supra at 756-757; Fisher v. Commissioner, 56 T.C. 1201, 1213 (1971); Proskey v. Commissioner, 51 T.C. 918, 924 (1969). Further, in this case, the payments to petitioner *617 were periodically increased with his length of service, which is another indication that the payments represented compensation rather than grants. See Adams v. Commissioner, 71 T.C. 477, 487 (1978); Rosenthal v. Commissioner, 63 T.C. 454, 460 (1975); Dietz v. Commissioner, 62 T.C. 578, 586 (1974). Petitioner correctly points out that DNR was under no obligation to offer him a full-time position following the completion of his doctorate, and that in Olick v. Commissioner, 73 T.C. 479, 490 (1979), we concluded that the absence of such an obligation is evidence of a lack of a recruitment motive on the part of the grantor. However, the existence of a clear expectation that the recipient will accept employment with the grantor is considered an indication that the payments place the grantor in a favorable position to recruit the recipient. Brubakken v. Commissioner, supra at 255; Smith v. Commissioner, 60 T.C. 279, 286 (1973); Ehrhart v. Commissioner, 57 T.C. 872, 882-883 (1972), affd. 470 F.2d 940 (1st Cir. 1973). From the record before us it *618 is clear that while DNR did not extend offers to all of its fellows upon attainment of their degrees, most if not all of those who were extended such offers accepted. With this history DNR knew that it could pick and choose among its fellows and extend offers to the more capable that were almost certain to be accepted. When this expectation is considered, together with DNR's statement in the memorandum of agreement that in the past the fellowship program had allowed it to obtain better trained personnel by contributing to their training and offering them permanent employment, a recruitment motive for maintaining the program could be attributed to DNR. Finally, petitioner relies on Rev. Rul. 75-280, 1975-2 C.B. 47, where respondent announced that he would assume that the primary purpose of a grant was to further the education and training of the recipient if the recipient, a candidate for a degree at an educational institution, performs research, teaching or other services for the institution which satisfies specifically stated requirements for the degree, and similar services are required of all candidates for the same degree. His reliance on the Revenue Ruling is *619 misplaced, however, because in the first place it is not precedent. Stubbs, Overbeck & Associates v. United States, 445 F.2d 1142, 1146-1147 (5th Cir. 1971); Twin Oaks Community, Inc. v. Commissioner, 87 T.C. 1233, 1252 (1986). Furthermore, in petitioner's case the services were not required by or performed for the University but for DNR. From all of the foregoing and the record as a whole, we are satisfied that respondent's determination should be sustained because petitioner has failed to establish that he is entitled to the exclusion provided by section 117. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, for the years 1984 and 1985, and all rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩